[Crim. No. 316.   Third Appellate District.—November 18, 1915.]

THE PEOPLE, Respondent, v. W. P. SIDWELL, Appellant.

CRIMINAL LAW—INVOLUNTARY MANSLAUGHTER—DEATH FROM GROSS NEGLIGENCE — DEGREE OF TURPITUDE. — While involuntary manslaughter may be committed in two different ways, the legislature has not recognized, as between those ways, any distinction in the degree of turpitude characterizing that crime; in other words, the crime is that of involuntary manslaughter whether the killing be committed in the execution of an unlawful act, etc., or in the execution of a lawful act, etc., or where death, not willfully or intentionally produced, is, nevertheless, caused by the gross or culpable negligence of the defendant—negligence which, in degree, goes so far beyond that negligence merely which suffices to impose a civil liability for damages as to constitute it criminal negligence, for which the party guilty of it may be held criminally liable.

ID.—NEGLIGENCE OF SPECIAL OFFICER—BREAKING INTO ROOM WITH LOADED PISTOL IN HAND—DISCHARGE FROM UNKNOWN CAUSE—VERDICT OF MANSLAUGHTER.—In the prosecution of a deputy sheriff and special police officer for the crime of murder, it cannot be said, as a matter of law, that the jury were not justified in returning a verdict of involuntary manslaughter, where the evidence shows that the crime was committed by the discharge of a loaded revolver through some unknown cause, while in the hand of the defendant and while he was engaged in forcibly effecting an entrance into a room where gambling was going on, and where there was gathered a number of persons sitting about a table in close proximity to the door broken open by the defendant, and it appearing that he was aware of their presence therein.

ID.—VERDICT OF INVOLUNTARY MANSLAUGHTER—GROSS NEGLIGENCE OF DEFENDANT—REJECTION OF EVIDENCE—REFUSAL OF INSTRUCTIONS— LACK OF PREJUDICE.—Where in a prosecution for murder one of the issues involved in the charge was whether, in the handling of the weapon, at the time of the fatal shooting, the defendant was culpably negligent, and if so, whether such negligence was the cause of the death of the deceased, and the jury returned a verdict of

involuntary manslaughter, which crime involves no element of intent, but proceeds solely from a degree of negligence which makes the act of killing unlawful, the defendant was not prejudiced by alleged erroneous rulings in the exclusion of evidence and in the disallowance of instructions justifying his conduct in breaking into the room of the deceased, and his right to carry such weapon in his hand at the time of the breaking.

ID.—NEW TRIAL—MISCONDUCT OF JURY—AFFIDAVITS OF JURORS—MISTAKEN OPINION AS TO NATURE OF CRIME.—A motion for a new trial upon the ground of the misconduct of the jury is properly denied where the same is based upon affidavits of two of the jurors, in which they alleged that they were at all times during the deliberations of the jury of the opinion that the defendant was entitled to an acquittal at their hands, and so voted up to the time that they were led to believe that the crime of involuntary manslaughter was not a felony under the laws of the state of California, and that had they known or believed that it was a felony, they never would have agreed to a verdict of guilty of such crime.

APPEAL from a judgment of the Superior Court of Lassen County, and from an order denying a new trial.   H. D. Burroughs, Judge.

The facts are stated in the opinion of the court.

Pardee & Pardee, for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

HART, J.—The defendant was charged, by information duly filed in the superior court of Lassen County, with the crime of murder, and, upon his trial on said charge, was convicted of the crime of involuntary manslaughter and thereafter sentenced by the court to serve a period of one year in the state penitentiary.

He appeals from the judgment of conviction and the order denying his motion for a new trial.

The homicide occurred at the town of Westwood, in said county of Lassen, on the fourteenth day of March, 1915.

It appears to be conceded, although we have been unable to find the facts to have been shown by the evidence, that the town of Westwood has been brought into existence within the last three years by the Red River Lumber Company, a corporation, maintaining an extensive lumber manufacturing

plant there; that said company owns all the real estate within said town or upon which it stands, and that the town has a population of approximately two thousand five hundred, all of whom are employees, or members of the families of employees, of said company.

It appears from the record that the company maintains a number of boarding, lodging and bunk houses, in which many of its employees are housed and boarded, and also a number of private residences for use by employees having families. One of the places so established and maintained by the company is the "Hotel Seville," in which a number of employees, principally those of the Spanish and Mexican races, occupied apartments.

It seems that the company, from the beginning of the time at which it established its enterprise at Westwood, laudably attempted to maintain the town as a peaceful and law-abiding community and to encourage and promote habits of sobriety and industry among its employees, and to that end adopted and promulgated a rule prohibiting gambling and the use of intoxicating liquors within the town limits among and by such employees. To enforce said rule, it was, quite naturally, deemed essential to police the town, and to some extent this was done, and thus a necessary and reasonable surveillance over the employees maintained.

The defendant had been commissioned by the company to discharge the duties of a special police officer, and, to vest him with authority to make arrests and otherwise enforce the law and the rules and regulations of the company within the limits of the town of Westwood, he was appointed a deputy sheriff by the sheriff of Lassen County. He had been given instructions by the officers of the lumber company to report to them any gambling among the employees of the company within the town which he might discover, and, furthermore, was instructed that, in the event he had reason to believe that gambling was being carried on in any room of any of the lodging and bunk houses, to break open the door of such room, if necessary, so that he might be able to identify and report to the company the names of the employees thus engaged in violating the rule against that practice.

The immediate facts and circumstances of the shooting are correctly told in the brief of counsel for the defendant as follows:

"About midnight, between the 13th and 14th of March, 1915, defendant, being on duty, took with him one Robert Weber, who was in the employ of the company and acting as night watch at the time, and started out to see if any of the men were gambling in any of the company's lodging or bunk houses. At about half an hour after midnight, in the morning of March 14th, they came to a lodging-house known as the Hotel Seville, and seeing from the outside that there was light in one of the rooms on the first floor of the building, they went inside, and by listening at the door of room No. 8, they heard what they believed to be the noise of gambling from within, and, finding the door locked, defendant determined to break it open. With this in view, according to his statement, he took his pistol—a Colt army special, double action revolver of 38-caliber—from his hip pocket and placed it in his left hand, so that he might take the door knob in his right hand and put his right shoulder against the door. The gun was not cocked—of this he is very positive—but the very instant the door was broken open the gun was discharged. This is shown by the evidence of five witnesses for the prosecution who were in the room at the time.

"By the evidence of the prosecution it is shown that there were, at the time, in the room, nine persons, all of them being Spaniards. They were sitting around a table, gambling. One sat in a chair behind the table facing the door; three sat on a bed on the left-hand side of the room and two on a chair, which was turned down, between the table and the door, so that the one man could sit on the legs of the chair, and the other on the back of the chair—the top of the chair back resting on the bed, which was on the right-hand side of the room as you go in.

"The man sitting on the legs of the chair, with his back to the door, was Francisco Escrivano, the one who was killed. The evidence shows that he was shot through the body—the bullet having entered a few inches above the crest of the hip and about half an inch to the left of the spine; the point of exit being about one and one-half inches above the navel and half an inch to the left of the middle line of the front of the body; the bullet having taken a horizontal course through the body, perforating the stomach and the bowels in several places.

"Defendant testified that he first thought, when he heard the discharge of the gun, that someone in the room had shot him, but he soon realized that he was not hit and that Escrivano was wounded. In any case, it is clear from the evidence that Escrivano immediately made an outcry in Spanish, and got up and moved about in such a way as to lead the witnesses to think at first that he was wounded in his leg. Almost immediately upon discovering that the man was wounded, and believing the wound to be in the leg, and therefore not necessarily serious, Sidwell gave his gun to Weber, told him to keep all the men in the room, and ran upstairs in the building to the clerk's room, where there was a telephone, and called up a nurse at the hospital, to have the doctor come at once to the Seville, that a man was shot in the leg. He then went back downstairs, by which time the man's friends had opened his clothing and discovered that he was shot through the body. When the defendant returned to the room and found this state of facts and found the man on, or partly on, his feet, he told the men to lay him on one of the beds; that he was too badly hurt to be allowed to stand up and walk around; and then immediately ran upstairs again and called up the stable to have a conveyance sent at once, to use as an ambulance, to take the man to the hospital. After coming downstairs the second time Sidwell became impatient because the doctor did not arrive promptly and, after a few minutes, started to the hospital to see what was delaying him. He met the doctor near the hospital and returned with him to the Seville. Escrivano was placed in a wagon—on a cot— but, the road being rough and causing him much pain, the cot was taken from the wagon and he was carried to the hospital by hand, the defendant assisting him. The doctor gave such attention to the case as was possible, but Escrivano died about 8 o'clock on Monday evening, March 15th.''

The above embraces a synoptical statement of all the facts brought to the attention of the jury.

The defendant complains: 1. That the evidence is insufficient to support the verdict; 2. That the court erred to his prejudice by its rulings excluding certain testimony; 3. That it likewise erred in its refusal to adopt and read to the jury certain instructions proposed by him; 4. That prejudicial error was committed in the order denying him a new trial on

the ground of the alleged misconduct of the jury, whereby a fair and due consideration of the case was prevented.

While it instructed the jury that the Red River Lumber Company, being the owner of the Hotel Seville, had the right to make a rule that no gambling would be permitted in any room or part of said hotel, and the further right to "direct and instruct the defendant to use all lawful means for the purpose of detecting persons engaged in gambling" in any of the rooms of said hotel, the court refused to instruct, as requested by the defendant, that the said company had the right to direct and authorize the accused to break into such rooms or houses, if necessary, for the purpose of ascertaining whether the rule of the company against gambling was being violated, and that the defendant, when breaking into the room of the deceased on the occasion of the shooting, "was actually within his legal rights." To the contrary, the court told the jury that the breaking into the room of the deceased by the defendant "was a wrong."

The court refused to permit the defendant to show that the penalty of violating the rule against gambling would be the discharge of those found engaged therein from the employment of the company, and, furthermore, disallowed testimony offered by the defense which would have shown or tended to show that the employees of the company expressed dissatisfaction with the company's inhibition against gambling, and that certain of them, not named and perhaps not individually known, had threatened to resist by violent means any attempt of the defendant or any special officer of the company to enter their rooms for the purpose of detecting them in the act of violating said rule.

"Manslaughter is the unlawful killing of a human being, without malice. It is of two kinds: 1. Voluntary—upon a sudden quarrel or heat of passion. 2. Involuntary—in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (Pen. Code, sec. 192.)

Thus it will be observed that, while involuntary manslaughter may be committed in two different ways, the legislature has not recognized, as between those two ways, any distinction in the degree of turpitude characterizing that crime. In other words, the crime is that of involuntary manslaughter,

29 Cal. App.—2

whether the killing be committed in the execution of an unlawful act, etc., or in the execution of a lawful act, etc., or where death, not willfully or intentionally produced, is, nevertheless, caused by the gross or culpable negligence of the defendant—negligence which, in degree, goes so far beyond that negligence merely which suffices to impose a civil liability for damages as to constitute it criminal negligence for which the party guilty of it may be held criminally liable.

Now, conceding that the court erred in instructing the jury that the defendant committed a wrong by breaking open the door of the room in which the deceased and others were supposed to be gambling, or, in other words, that the defendant had no legal right to break into a room or house of the company for the purpose of apprehending its employees in the act of violating the rule against gambling; conceding, further, that the court should have allowed the defendant to prove that the employees were dissatisfied with said rule and had threatened to do violent injury to the defendant or any other employee who might undertake to detect them in the act of gambling in the houses or rooms of the company, and, further, assuming that the court erred in not permitting the defendant to show what would be the result to the employees if found in the act of gambling contrary to said rule; conceding, furthermore, what is true as a legal proposition, that the defendant had the right to carry a deadly weapon upon his person and the right, in view of the threats above referred to and which had previously been communicated to him, to carry such weapon in his hand at the time he attempted to ascertain whether gambling was going on in the room in which the fatal shooting occurred—conceding, we say, the legal integrity of all the foregoing propositions, still one of the issues involved in the charge against the defendant was whether, in the handling of the weapon, *at the time of the fatal shooting,* he was culpably negligent, and, if so, whether such negligence was the cause of the death of the deceased, and, in view of the conclusion of the jury that the accused was guilty of involuntary manslaughter, which crime involves no element of intent, but proceeds solely from a degree of negligence which makes the act of killing unlawful, it cannot be conceived or justly be declared that he suffered any prejudice by reason of the alleged errors complained of; for, by the verdict, he was given the full benefit of whatever force there might have been

in the excluded testimony and the instructions proposed by him but disallowed by the court. Whether the killing was the result of "the commission of an unlawful act, not amounting to a felony," or occurred "in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection," the defendant could obviously have been convicted of no less a crime than that of which he was found guilty, even if the testimony and the instructions whose disallowance by the court constitutes the ground of the objections under consideration had been admitted and given. In other words, it being true, as the code section declares, that involuntary manslaughter may be committed while the party responsible for the killing is doing a lawful act, and, assuming that the rejected testimony and instructions would have conveyed to the jury certain facts and principles of law in all respects sound and pertinent to the charge as laid in the information, yet, if the evidence was sufficient to convince the jury that the discharge of the weapon was directly due to the gross or culpable negligence of the defendant in the handling of the weapon at the time of its discharge, and that such negligence was the cause of the death of Escrivano, then, since he was found guilty of the lowest crime of which he could be convicted under the information, the rulings excluding the proffered testimony and disallowing the proposed instructions could not have had a harmful or prejudicial effect upon the substantial rights of the accused.

As we conceive it, the principle thus applied is the same as where an erroneous instruction peculiarly applicable to a charge of murder of the first degree has been given and the verdict is one of guilty of murder of the second degree or of manslaughter. Repeatedly it has been held that in such case, even though the instruction might be prejudicially erroneous where the verdict was of the first degree, a verdict of guilty of the lesser degree of murder or of manslaughter would render the instruction innocuous in its effect upon the rights of the accused.

We now come to a consideration of the proposition, urged with much vigor by the defendant, that the jury were not justified by the evidence in finding him guilty of any crime or degree thereof embraced within the crime charged.

The question, however, with respect to the evidence which this court is alone authorized to determine is whether we can

say, from the record, as a matter of law, that the jury were not justified in finding the verdict they returned; and it may just as well here be stated that, after a careful review of the whole record, we are constrained to the conclusion that we would not be justified in so declaring. In other words, the evidence as it is brought before us is such that whether the defendant was culpably negligent in the handling of the weapon at the time the fatal shot was discharged therefrom and, if so, whether such negligence was the cause of the death of Escrivano, are questions which it was for the jury to determine, and not within the legal competence of this court to review.

The general facts of this most unfortunate affair are given above. But precisely how or in what manner the pistol was discharged, the evidence does not disclose, nor, indeed, under the circumstances, is it to be supposed that anyone would know, unless it was the defendant himself. He, however, declared that he could not, except by mere conjecture, explain the direct cause of the discharge of the weapon, although the theory advanced by the defense is that he must have had his finger upon the trigger of the weapon when he was in the act of forcing the door open and have unconsciously pulled the trigger as the door gave way under the force he put upon it.

The weapon, according to the evidence and the testimony of the defendant himself, was what is known as a ''self-cocker,'' and operates automatically—that is, it is one of those revolvers that are discharged by means of pressure upon or the pulling of the trigger. As seen, at the time the defendant attempted to and did shove the door in he held the weapon uncocked in his left hand, using his right hand and shoulder to break open the door. The instant the door gave in from the force applied to it by the defendant, the weapon exploded. In other words, the giving way of the door and the discharge of the pistol were approximately simultaneous. The only plausible explanation of the cause of the discharge is that either the trigger came in contact with some part of the door when it was forced open in such manner as to throw the lock back or, as the defense suggest, the defendant had his finger upon the trigger at the moment he exerted the force necessary to shove the door in and at the same instant of time involuntarily pulled the trigger—a movement which could be influenced or caused by the exertion employed in breaking open the door by means of the force required to be exerted for that purpose. This latter

theory is the more plausible of the two and, as seen, coincides with the view of the defendant as to the cause of the discharge of the weapon. It, however, only emphasizes the fact of the recklessness in handling a loaded firearm near the presence of others when the party handling it is at the same time attempting some other act which must necessarily distract his attention from the weapon. But whatever might have been the direct cause of the discharge of the weapon, the fact remains that it was discharged through some cause while in the hand of the defendant, and while he was engaged in forcibly effecting an entrance into a room where there was gathered a number of persons sitting about a table in close proximity to the door broken open by him and of whose presence there he was aware.

The handling of a loaded firearm in a public street or in a building or other place where a number of people are assembled or are passing to and fro is always attended with more or less danger, even where some degree of care is exercised in the handling of such weapon; but how much more danger must there be in the handling of such weapon by a person at a time when his mind is occupied by another matter of paramount concern to him. His mind could not at that time be upon the weapon to such a degree as to enable him to handle it with the care and caution with which ordinarily he would probably handle it. That the defendant's mind was not upon his weapon as he was forcing the door open, is very clear from the fact that he did not know precisely how it came to be discharged. It would seem to be true that the act of the defendant in holding in his hand a loaded weapon at the time he was engaged in forcing an entrance into the room, thus bringing into play much, if not all, of his physical power, and with his mind centered upon getting into the room, itself constituted gross or culpable negligence. At all events, the jury could reasonably have so viewed that act, and their verdict implies that they did thus view it, and, as before stated, we are unprepared to say, as a matter of law, that they reached an erroneous conclusion or that the result of their consideration of the evidence is not justified.

The next and last point to be considered involves the question of the alleged misconduct of the jury.

It appears that after the case had been submitted to the jury and the latter had retired to the jury-room for deliberation and had thus been out for some time, they caused to be

conveyed to the judge information that they desired further instruction as to the amount of punishment to which the defendant would be amenable in the event of the return of a certain verdict. The court thereupon ordered the jury to be brought before it and, this being done, the foreman, after stating that they had not agreed upon a verdict, remarked: ''The jury would like to ascertain the degree of punishment that would follow conviction of either one of the degrees of murder charged in the complaint.'' To which the court replied that, except as to the crime of murder of the first degree, the matter of punishment was wholly a province of the court, and, consequently, one with which the jury had no concern, and declined to give them any information upon the subject. The jury were thereupon returned to the jury-room for further consideration of the case.

In support of his motion for a new trial upon the ground of the asserted ''misconduct of the jury by which a fair and due consideration of the case has been prevented'' (Pen. Code, sec. 1181, subd. 3), the defendant filed and introduced affidavits by two of the jurymen in which they alleged that they were at all times during the deliberations of the jury of the opinion that the defendant was entitled to an acquittal at their hands, and so voted up to the time that they were led to believe that the crime of involuntary manslaughter ''was and is not a felony under the laws of the state of California; and affiants further say that to the best of their knowledge and recollection each and every member of said jury, while deliberating upon said case, expressed himself as believing that the crime of involuntary manslaughter is and was not a felony under the laws of the state of California''; that had they known or believed that the crime of involuntary manslaughter was a felony under the laws of the state of California, they ''never would have consented or agreed to a verdict of guilty of such crime in said action.''

The reply to the contention that the showing thus made entitled the defendant to a new trial is that the affidavits of jurors cannot be received or considered for the purpose of impeaching their verdict. (*People* v. *Azoff*, 105 Cal. 632, [39 Pac. 59]; *People* v. *Soap*, 127 Cal. 408, 411, [59 Pac. 771]; *People* v. *Emmons*, 7 Cal. App. 685, [95 Pac. 1032].) In the Soap case, *supra*, the ground of the alleged misconduct of the jury was precisely the same as that upon which the defendant

in the case at bar based his affidavits alleging misconduct. The court in that case said: "It has been definitely settled that the affidavit of a juror cannot be received to impeach the verdict except where it is the result of a resort to the determination of chance."

We have now considered and disposed of all the points urged for a reversal.

The judgment and the order appealed from are affirmed.

Chipman, P. J., concurred.

BURNETT, J., Concurring.—I concur in the judgment and the foregoing opinion, but I desire to add that, in my judgment, if the defendant had shown the facts that he sought in vain to introduce in evidence, it would have afforded no justification nor excuse for his conduct in needlessly imperiling the lives of the men in the room. The mere circumstance that gambling was being carried on was not sufficient, as I view it, to warrant the defendant in breaking down the door, with a loaded pistol in his hand. Especially would this be true when he had reason to believe that a fatal affray might ensue. His desire and that of the company to suppress gambling was, of course, commendable, but the method resorted to was too drastic. Human life is too precious to be jeopardized for the purpose of ascertaining whether parties are engaged in a peaceful game of poker. Defendant should have directed the inmates to open the door before resorting to such violence, and I think he should have gone away rather than plunge into the room with his loaded revolver in his hand. Our aversion to vice should not blind us to the more vital consideration of life itself.