[Crim. No. 1875. Third Dist. Nov. 27, 1944.]

THE PEOPLE, Respondent, v. SHIRLEY WILLIAM CORLETT, Appellant.

34

36

J. Oscar Goldstein and Burton J. Goldstein for Appellant.

Robert W. Kenny, Attorney General, and David K. Lener, Deputy Attorney General, for Respondent.

THOMPSON, J.—The defendant was charged with an assault upon James Carl Stafford, on October 31, 1943, with a deadly weapon with intent to commit murder. In a second

count of the information he was accused, under section 245 of the Penal Code, of an assault upon the same person with a deadly weapon. The jury acquitted him of the first charge, but convicted him of the crime of an assault with a deadly weapon. A motion for new trial was denied. From the judgment of conviction and from the order denying a new trial the defendant has appealed.

As grounds for reversal the appellant contends that the judgment is not supported by the evidence; that the court erred in giving to the jury and in refusing certain instructions. It is also asserted that the court erred in several specified rulings upon the admissibility of evidence, and in unduly restricting defendant's cross-examination of witnesses. The comments of the trial judge, in passing upon objections to evidence, are likewise assigned as prejudicial error.

The defendant was engaged in farming rice in Colusa County. He lived on the premises and employed sixteen men to assist in the farming enterprise. Among those farm hands was the prosecuting witness, James Carl Stafford. He had been employed by the defendant for some time. His chief business was driving a truck. The men, including Mr. Stafford, occupied bunkhouses situated on the farm. They ate together in a large messroom in the main building. They were paid for their services $1.00 per hour, and were furnished their meals. The defendant had difficulty in supplying them with sufficient meat to satisfy them, without the aid of their food ration books. He had often requested them, including Mr. Stafford, to turn in their ration coupons. He said Stafford told him his ration book "was in Colusa with his girl and he didn't know whether he would bring it or not." The defendant also claimed he had trouble with Mr. Stafford on account of his failure to perform his farm duties. He said he had been informed "Stafford isn't getting the loads in." There is evidence to indicate that Stafford had previously been in considerable trouble, and that he may have been quarrelsome and dangerous. The defendant testified that he inquired about Stafford and learned those facts. He said "I investigated him this morning and [decided] the best thing to do is to get rid of him."

At six o'clock on the evening of October 30th, Stafford met the defendant and asked him for his pay check, saying "I want to get off early." There was some dispute regarding the

amount which was due, but the defendant gave him a check for $47, and then asked him if he intended to deliver his ration book. Stafford replied, "I don't think so." The defendant then said "Don't come back then." He said Stafford shrugged his shoulders and warned him, "You will be sorry." Stafford then drove away in his own machine and returned the following morning.

Mr. Stafford testified that he received the $47 check, and drove to his uncle's ranch twelve miles south of Yuba City to return his .22 caliber rifle which he had previously borrowed to shoot hawks and pheasants with. Without request the uncle handed Stafford his (Stafford's) own .25 caliber revolver which had been left with the uncle. Stafford threw it onto the seat of his automobile and drove to Marysville, where he spent several hours at the Aloha Club. He then drove to Colusa, where he arrived about three or four o'clock Sunday morning, and went to bed in an auto court. After about one and one-half hours' sleep he arose and returned to the Corlett ranch where he arrived about eight o'clock that morning. As he got out of his automobile he picked up the revolver from the seat of the car and put it in his pocket, saying that he did so to prevent someone from taking it. He then entered the dining room for breakfast. Mr. Corlett was present.

After breakfast an employee by the name of Griffin asked Stafford to take a truck and haul a bale of sacks "down to the rig." He agreed to do so. For that purpose he got into a truck and started the motor. The defendant, who was standing by the gate, shouted at him to "shut her down, shut her down." Stafford stopped the motor, got out of the machine and "asked him what was the matter?" A controversy ensued. Corlett was very angry and told Stafford he could not go to work; that he was discharged. Stafford testified that Corlett called him a "god-damned s-of-a-b," and "told me to leave the place." He said he requested the defendant to "give me time to get my clothes" from the bunkhouse. He said that Corlett ordered him off the place, saying that "he would get his gun." Stafford said that, when Corlett threatened him with a gun, he replied that he had one of his own, but didn't "need it." When Corlett asked him where the gun was, Stafford took it from his pocket and exhibited it in the palm of his hand. Then he replaced it, and walking to his own machine, which was parked nearby, he got in and drove off toward the bunkhouse

for the purpose of securing his personal effects and then of leaving the ranch. The defendant corroborated those facts, except that he did not admit that he threatened to get his rifle.

On his way to the bunkhouse Stafford passed two workmen, Frank Dawson and George Kaufman. He told the latter that he "had got canned and not to work too hard." He drove his machine to his bunkhouse and parked it near the door, for the purpose of removing his personal effects. When Stafford left, the defendant entered his house, but observing Stafford's car going toward the bunkhouse, he took his rifle and got into his machine and drove over there, parking about a car-length behind the Stafford machine. He immediately got out, and after some controversy he seized his rifle and shot Stafford through the shoulder. There is an absolute conflict of evidence regarding the circumstances attending the actual shooting.

The defendant testified that he had trouble with Stafford over his ration book, and on account of his failure to properly perform his farm duties. He said he had been told of Stafford's previous difficulties; that he had investigated his conduct and made up his mind to get rid of him. He claimed to have overheard Stafford say as he came out of the mess hall that morning that, "The big so-and-so fired me last night and thinks he is going to get away with it. I wonder how he would like to lose another building." No other witness corroborated that statement. There is evidence that Stafford had been previously involved in other affrays, and that he had a reputation as a violent and a quarrelsome man.

Regarding the incident of Stafford's attempt to comply with Griffin's request to haul the sacks with a truck Sunday morning, the defendant testified that he did order him to shut off the motor and to get out of the truck. Corlett said that when he hollered at Stafford, he stopped the motor and got out of the truck and said "What the hell is the matter?" The defendant said he then replied, "I told you you weren't going to work, you were fired"; that Stafford cursed him and "whipped out an automatic," saying, "I can whip you any day you want and I have got a gun and I stand behind it, go and get your gun." The defendant, however, admitted that Stafford then made no attempt to use his revolver, but that he put it back in his pocket and drove off toward the bunkhouse, saying "he wanted to get his socks." Corlett testified that he returned to his house, but when he looked out of the window and saw

Stafford's machine parked at the bunkhouse "I went down stairs and got my gun . . . and drove over to the bunkhouse, . . . to look after my property." The defendant explained that he had previously lost two buildings, and said that he didn't know whether Stafford "was going to shoot me or burn my house down." The defendant stopped his machine a short distance behind Stafford's parked car, and promptly got out of his automobile. His rifle was resting against the front seat in the car. Stafford stood by the side of his own machine twenty or twenty-five feet distant. There is a radical difference between their stories with respect to what actually transpired at the time of the shooting. Mr. Stafford testified in that regard:

"Q. Did you see Mr. Corlett come to the vicinity of the bunkhouse? A. I didn't see him come, no sir. Q. When was the first time you saw him? A. When he hollered 'I am going to kill you, you god-damned s-of-a-b.' . . . Q. Anything else? A. 'Throw that gun on the ground.' Q. Where was your gun at that time? A. In my right front pocket. . . . Q. Did you say anything back to Mr. Corlett? A. I started to say 'Let me explain.' . . . Q. Did he fire a shot from his rifle? A. Yes sir. . . . I hadn't gotten the 'explain' hardly out of my mouth when he shot. . . . Q. What happened to you? A. I fell forward on my face. . . . He walked up straddle of me and I hollered 'Oh god, don't shoot me any more, you have already killed me,' and he stooped over . . . and turned me over on my back. . . . Q. When he fired the shot where was your gun? A. In my right front pocket."

Stafford testified that he was shot through the shoulder and fell to the ground upon his face, and that the defendant then walked up to him, rolled him over, took his revolver from his pocket and walked away. When the defendant reached the house he told Frank Dawson that he had shot Stafford and he directed Dawson to take him to the hospital at Colusa. Corlett handed Stafford's revolver to a man by the name of Russell, who subsequently delivered it to the sheriff.

The defendant said that he took his rifle from his home and drove over to the bunkhouse to eject Stafford from the premises, and to "look after my property." He claimed that he feared Stafford might burn his building. He said he didn't know whether Stafford "was going to shoot me or burn my house down." Corlett testified that, when he stopped his machine, Stafford was standing near the rear of his own car, and

that he then had no revolver in sight. The defendant said that when he started to get out of his automobile Stafford pulled his revolver from his pocket and said "Get back in there or I will shoot you." Corlett testified that "I reached for my rifle. . . . I took a couple of steps toward the front end of the car, and he had his automatic out and he was fumbling with the safety on it, and he had it pointed toward me and I said 'Stafford, drop that gun,' and he raised his gun and as he raised it, I fired a shot." The defendant claimed to have fired his rifle from his hip, without placing the butt to his shoulder. He said that he did not intend to shoot Stafford, and that when he fired his rifle Stafford's revolver fell to the ground and he walked over and picked it up and drove away. The defendant did not claim that he shot Stafford to prevent him from then damaging the property.

Evidently the jury believed Mr. Stafford's story of the shooting, or the defendant would have been acquitted.

It is not seriously contended there is insufficient proof of an assault with a deadly weapon to support the judgment. It was the sole province of the jury to determine which person told the truth regarding the circumstances of the affray. In support of the verdict it may be reasonably inferred that if the defendant was really afraid that Stafford would shoot him, he would have remained away from the bunkhouse until after Stafford had left the ranch. Instead of doing so, he deliberately took his rifle and drove down to the bunkhouse, parking his machine directly behind Stafford's car, and then he got out and advanced toward him two steps before he fired the rifle. That does not appear to be the conduct of a man who was afraid of being shot. Nor does it seem likely that if Stafford had intended to burn the defendant's bunkhouse, he would have proceeded to do so in broad daylight and in the presence of other workmen. It is evident that the jury believed that the defendant was the aggressor in that affray, and that he did not shoot Stafford in necessary self-defense, anticipating that he was about to receive great bodily harm at his hands. On the contrary, it is entirely reasonable to believe that when Stafford was discharged and ordered to leave the premises, he would naturally wish to remove his personal belongings from the bunkhouse before he departed.

The defendant may not reasonably contend that he accidentally shot Stafford. He did say that he fired the shot

with his rifle at his hip, and that he did not intend to hit him. But he testified that when Stafford told him to get back in his car or he would shoot him, he deliberately reached for his rifle and advanced two steps toward him; and when Stafford raised his gun and pointed it at him, he said, "I fired the shot." That statement infers a deliberate intent to shoot Stafford in what the defendant would have the jury believe was necessary self-defense.

The defendant may not complain of failure to adequately instruct the jury upon the essential elements of an assault with intent to commit murder, for he was acquitted of that charge. The jury either believed he was not guilty of an intention to kill Stafford, or, at least, they gave him the benefit of a doubt upon that particular issue. The verdict of the jury merely found him guilty of an assault with a deadly weapon, which, under the circumstances of this case, necessarily infers that he did not intend to kill his adversary. The verdict having been favorable to the defendant on the subject of the intention to kill Stafford, he may not complain of a failure, if any, to adequately instruct the jury on that particular subject.

The appellant challenges the giving of plaintiff's instructions numbers 9, 10, 10a, 11 and 21, as prejudicially erroneous. Each of those five instructions involved the general principle of self-defense and the particular phase thereof applicable to one who stands his ground and uses a deadly weapon against his assailant, in the belief, as a reasonable man, that he is in imminent danger of receiving great bodily harm. None of those instructions refers to the charge so frequently criticized by the authorities to the effect that it is necessary for a defendant to first "retreat to the wall" before he may resort to a deadly weapon in necessary self-defense. The clear import of each of those five instructions, in spite of the fact that some of them were couched in negative language, is that the jury was informed that if the defendant, acting as a reasonable man, had cause to believe he was about to receive great bodily harm at the hands of Stafford, he had a right to stand his ground and shoot or even kill his assailant. Instruction number 11 said in that regard:

"Where one without fault is placed under circumstances sufficient to excite the fears of a reasonable person, that another person designs to commit a felony or some great bodily

injury upon him, and said circumstances afford grounds for reasonable belief that there is imminent danger of the accomplishment of this design, he may, acting under these fears alone, shoot or slay his assailant and be justified by the appearances.''

The right of the defendant to use a deadly weapon and to shoot or even kill his adversary, if the circumstances warranted him in believing, as a reasonable person, that he was in imminent danger of receiving great bodily harm, was fully and clearly covered by other instructions upon that subject which were given to the jury at the request of the defendant. Defendant's instruction number 69 informed the jury that an assault with a deadly weapon is justifiable when it is accomplished in ''resisting any attempt . . . to do some great bodily injury upon any person.'' Defendant's instructions numbers 2, 107 and 112, which were given, clearly charge the jury in strong, affirmative language favorable to the defendant, that if they believed from the evidence that Corlett went to the bunkhouse for the purpose of lawfully protecting his property, and that Stafford became angry and drew his revolver, and that, from Stafford's conduct and the surrounding circumstances, the defendant believed, as a reasonable man, that he was about to receive bodily injury at the hands of Stafford, he ''had a right to reach for his rifle in his own defense, and shoot Stafford even if it killed him.'' In said instruction number 107, the jury was told that ''It does not matter if such danger was real or apparent; and if the defendant Shirley William Corlett acted in self defense from real and honest convictions as to the character of the danger, induced by the existence of circumstances [such] as would appear to a reasonable man, you should find him not guilty, even though he was mistaken as to the extent of the danger.''

We are convinced that the jury was fully and fairly instructed on every essential element of self-defense applicable to the facts of this case, and that none of said five challenged instructions is prejudicially erroneous.

█ It is true that plaintiff's instruction number 10 did state that to justify the defendant in using a deadly weapon in the belief that he was in imminent danger of great bodily harm, ''the danger must have appeared to defendant Corlett to have been so urgent and pressing that, in order to save his own life or to prevent his receiving great bodily harm, the

killing or shooting of Stafford *was absolutely or at least reasonably necessary."* (Italics added.) The use of similar language, including the italicized word "absolutely," was criticized by the Supreme Court in a late decision in *People* v. *Holt,* 25 Cal.2d 59 [153 P.2d 21]. The erroneous use of that word, however, was held not to constitute reversible error because the jury was elsewhere correctly instructed that if the defendant, as a reasonable man, was warranted in believing that he was in imminent danger of great bodily harm, he was justified in shooting and killing his adversary and would be excusable for the homicide on the doctrine of necessary self-defense. In that case the defendant was convicted of murder of the first degree, without recommendation. The Supreme Court reduced the judgment to murder of the second degree.

In the present case the jury was clearly and correctly elsewhere instructed regarding the well known principle that the circumstances which may justify a defendant in shooting his assailant must be such as would warrant a reasonable person to believe that it was necessary to do so to protect him from imminent danger of great bodily harm. Moreover, in this case, the objectionable word "absolutely" was not used unconditionally. It was immediately followed by the alternative, "or at least reasonably necessary." It follows that, for the same reason assigned in the Holt case, the use of that word "absolutely" in said challenged instruction does not render it reversible error. It will be observed that the jury in this case was not definitely told that the right to use a deadly weapon depended solely upon the question as to whether it was *absolutely* necessary. That word was modified and used in the alternative only. The challenged instruction says that before the defendant could resort to a deadly weapon it must appear that the "shooting of Stafford was absolutely *or at least reasonably necessary."* On the authority of the last cited case, we are satisfied the use of the word "absolutely," in the alternative, was not misleading or prejudicial. Certainly it was not reversible error.

There is nothing in the late opinion of the District Court of Appeal, in the case of *People* v. *Hatchett,* 63 Cal.App. 2d 144 [146 P.2d 469], or in any of the other cases relied upon by the appellant, in conflict with what we have previously said regarding the five challenged instructions. In the Hatchett case, the defendant was convicted of manslaughter on purely circumstantial evidence. There was no eyewitness to the af-

fray in that case. The defendant offered an instruction on the subject of circumstantial evidence, which was refused. Other proffered instructions, which were deemed to be correct and which contained essential statements of the law were refused. The court said "Defendant's two proposed instructions which we have quoted should have been given." It is true that the court criticized negative language used in the four Hatchett case instructions, which language was similar to the negative language used in the preceding five challenged instructions of this case. But the Hatchett case was not reversed on that account. The reviewing court conceded that the four Hatchett case instructions correctly stated the law. It said in that respect:

"It is true that the four instructions given at the request of the People *do not incorrectly state the law of self-defense,* but they stated the rule negatively and from the viewpoint solely of the prosecution." (Italics added.)

The opinion in the Hatchett case assigned numerous other reasons for reversing that judgment. It criticized the negative form of the said four instructions because they were the only ones given to the jury on that particular subject. In the present case several other instructions on that same subject, which were couched in strong affirmative language favorable to the defendant, were offered by him and given to the jury. The mere negative form of the five challenged instructions in this case may therefore not be said to be prejudicial to this defendant as were the criticized ones which were given in the Hatchett case. That case is not authority for the reversal of this case on the ground of the mere use of negative language contained in the five instructions which correctly stated the principles of law discussed therein.

■■■ The court did not err in failing to instruct the jury, on its own initiative, upon the subject of circumstantial evidence. The jury was fully and fairly instructed that the defendant was presumed to be innocent and that the burden of proof of every essential element of the crime rested upon the prosecution to establish his guilt beyond a reasonable doubt. The jury was told that the burden did not shift from the prosecution on account of the defendant's claim that he shot Stafford in self-defense, or otherwise. This is not a circumstantial case. The proof of the assault itself was dependent almost entirely upon the direct evidence of the defendant and

48

the prosecuting witness. Both were examined at great length. There was no occasion to give to the jury an instruction on the subject of circumstantial evidence. The instructions which were given correctly informed the jury upon all of the essential elements of the crime with which the defendant was charged and upon his theory of defense upon which the case was tried. ■ The degree of proof required to support a verdict of conviction applies alike to both circumstantial and direct evidence. *(People* v. *Bailey,* 82 Cal.App. 700, 706 [256 P. 281] ; 8 Cal.Jur. 191, § 266.) In the case last cited it is said, "The law makes no distinction between circumstantial evidence and direct evidence in the degree of proof required for conviction." ■ The prosecution relied, in this case, on direct evidence. Whatever circumstances that appear in evidence were merely incidental to or corroborative of the direct evidence of the eyewitnesses to the affray. It has been repeatedly held it is not error for the court to refuse to instruct juries upon the subject of circumstantial evidence where the cases depend chiefly on direct evidence. *(People* v. *Lapara,* 181 Cal. 66, 70 [183 P. 545] ; *People* v. *Lonnen,* 139 Cal. 634 [73 P. 586] ; *People* v. *Harvey,* 109 Cal.App. 111 [292 P. 654] ; *People* v. *De Voe,* 123 Cal.App. 233 [11 P.2d 26] ; *People* v. *Williams,* 134 Cal.App. 232 [25 P.2d 259] ; 8 Cal.Jur. 369, § 404.)

The appellant assigns the refusal to give his proffered instructions numbers 76, 77, 83 and 164, as prejudicially erroneous. ■ The first one was properly refused because it stated in effect that when circumstantial evidence is relied upon to establish the guilt of the defendant each fact or circumstance must be proved beyond a reasonable doubt and if any material circumstance in the chain of evidence is not so proved the defendant must be acquitted. This case did not depend upon mere circumstances. It depended almost entirely upon the direct evidence of the defendant and Stafford. The circumstances, such as their disagreement over the delivery of ration coupons, and over hauling of sacks with a truck on Sunday morning, and the evidence of the alleged bad character of Stafford, were adduced by the defendant to establish his claim of having shot Stafford in necessary self-defense. That evidence was merely incidental to the proof of the actual assault with a deadly weapon. Instruction number 76 was therefore misleading. ■ Instruction number 164 defined

circumstantial evidence. For the reasons previously stated it was not prejudicial error to have refused to give it to the jury.

 The other two instructions merely charged the jury that if they entertained a reasonable doubt about any material circumstance in the chain of evidence, the defendant was entitled to the benefit of that doubt and that he should therefore be acquitted. That principle of law was adequately covered by several other instructions which were given to the jury. For instance, defendant's instruction number 149 closed with the charge that,

"This presumption of innocence is an instrument of proof created by the law in favor of one accused, whereby his innocence is established until sufficient evidence is introduced to overcome the proof which the law has created. *Every reasonable doubt* or presumption arising from the evidence *must be construed in favor of the defendant Corlett.*" (Italics added.)

In defendant's instruction number 54, the jury was again charged as follows:

"The law requires more than mere probability of guilt; it requires that the jury be satisfied and convinced of guilt to a moral certainty and beyond a reasonable doubt; therefore, if you are not convinced to a moral certainty and beyond a reasonable doubt of the guilt of the defendant, but if you conclude notwithstanding that the defendant is probably guilty, you nevertheless must find the defendant Shirley William Corlett 'not guilty'."

Again, in the court's instruction number 17, the jury was charged that,

"In this case the burden rests upon the prosecution to establish every element necessary to constitute the guilt of the defendant to a moral certainty and beyond all reasonable doubt."

 The appellant charges the court with prejudicial error in failing to instruct the jury in accordance with section 2061, subdivision 4, of the Code of Civil Procedure, as stated in his proffered instructions numbers 156 and 158, that evidence of certain alleged oral declarations of the defendant should be considered "with caution." It has been held that such cautionary instructions may be refused as "mere commonplace" statements; that "a judgment will not be reversed either for the giving or the refusing of this instruction." (*People* v. *Raber*, 168 Cal. 316 [143 P. 317]; *People* v. *Hansen*, 130 Cal.App. 217, 220 [19 P.2d 993].) Moreover,

the appellant failed to specify or identify in his briefs the alleged admissions of the defendant to which he refers, by either reference to the record where they may be found, or by stating the language to which they apply. The appellant has therefore waived his right to rely on that assignment of error, even if it has merit, which we do not concede. Rule 15 of Rules on Appeal provides that ''The statement of any matter in the record shall be supported by appropriate reference to the record.'' The transcript consists of 877 pages, and a reviewing court may not be expected to search the record to discover whether alleged admissions of the defendant are contained therein.

 The appellant has assigned as reversible error the refusal of the court to give to the jury twenty-two instructions offered by him on the theory that he had a right to shoot Stafford in defense of the curtilage as an inseparable part of his dwelling house to prevent damage to his property, as distinguished from mere necessary self-defense of his person. Those refused instructions include defendant's proffered instructions numbers 35, 117 and 119 to 140, inclusive. We are of the opinion the court did not err in rejecting those instructions. They are adequately covered by other instructions which were given to the jury. They were drawn on the theory that Stafford was a trespasser. The evidence clearly shows that he was not a trespasser. He was an employee who may have been discharged, but who, after a request to secure his personal belongings, was apparently proceeding to get them from the bunkhouse where he was accustomed to sleep. There is no evidence that the defendant had denied Stafford the privilege of first procuring his personal effects. He was undoubtedly entitled to peaceably do so. He returned to the ranch Sunday morning and ate breakfast in the mess hall with the other workmen. The defendant was then present and made no objection to his doing so. The defendant testified that it was the custom and permissible for discharged employees to remain overnight and to partake of a last meal before they were expected to leave the premises. After breakfast, at the request of a workman, Stafford, evidently assuming he was still an employee, proceeded to haul sacks of rice. It was at that time the defendant told Stafford he was fired. But when Stafford said ''Give me time to get my clothes,'' the defendant did not refuse that request. Those facts indicate clearly that Staf-

ford was not a trespasser on the premises. For the reason that Stafford was not a trespasser, section 602(j) of the Penal Code, upon which the appellant relies, is not in point. That section merely provides that,

"Every person who *wilfully commits any trespass,* by either: . . .

(j) Entering any lands, whether uninclosed or inclosed by fence, for the purpose of injuring any property or property rights or with the intention of interfering with, obstructing, or injuring any lawful business or occupation carried on by the owner of such land, his agent or by the person in lawful possession; . . . Is guilty of a misdemeanor."

At the actual time of the shooting the defendant did not tell Stafford he could not enter the bunkhouse to get his clothing and effects. He did not warn him that if he did not immediately leave the premises he would use his weapon to force him to do so. The defendant did not claim that he shot Stafford to prevent him from entering the bunkhouse or from burning or doing damage to the property. His sole defense was that he shot Stafford in necessary self-defense because he first threatened to shoot him and because Stafford actually resorted to overt acts to carry out that threat by pointing his revolver directly at the defendant and by fumbling with the safety device. It does not seem reasonable that if Stafford was actually pointing his revolver at the defendant and threatening to shoot him, Corlett would have taken the time to reach for his rifle and then to step forward two steps before he fired his rifle. We are of the opinion there is no substantial evidence to warrant the defendant in believing, as a reasonable man, that Stafford was about to burn or damage the bunkhouse. He certainly was making no effort to accomplish that purpose at the time of the shooting. It is evident that the only valid defense which the appellant may reasonably urge was that, as a reasonable man, he believed that he was about to be shot by Stafford and that he therefore shot him in necessary self-defense. But the jury found that issue against the defendant, and the jury had the sole province of determining the credibility of the respective stories told by the defendant and the prosecuting witness.

Most of the rejected instructions were erroneous in failing to state that the owner of property is justified in using force or a deadly weapon to eject a trespasser only *when it*

*is manifest to one, as a reasonable person,* that injury to the property is contemplated, and that the owner is then entitled to use only such force as is *reasonably necessary* to justify the attack or to protect the property. (*People* v. *Teixeira,* 123 Cal. 297 [55 P. 988]; Civ. Code, § 50; 26 Am.Jur. 272, § 172; 40 C.J.S. 976, § 110; 25 A.L.R. 547, note; 9 So. Cal. L. Rev., 377.) In the Teixeira case, *supra,* it was held that the refusal to give such defective instruction was not erroneous. The court said:

"Error is predicated upon the refusal of the court to give the following instruction: 'If the defendant at the time of the alleged assault was engaged in the defense of property lawfully entrusted to his care, and which it was his duty or his right to maintain the possession of, the assault was justified, and you should acquit him.' *This instruction places no limit upon the amount of force which the defendant might use in the defense of the property in his possession. In law he was only entitled to use that amount of force necessary for the protection of his property. The instruction fails to make the distinction."* (Italics added.)

In 40 C.J.S., 972-976, section 109, it is said with respect to the right to resort to force in defense of habitation that,

"A person is justified in taking life in defense of his habitation where it is actually or apparently necessary to do so in order to repel another person who attempts to enter in a forcible or violent manner for the apparent purpose of committing a felony therein on either person or property. . . .

"The right . . . is subject to the qualification that the danger must be imminent. . . . The attempt must be manifest, that is, it must be so plainly made that no reasonable doubt exists as to the purpose of the aggressor, and a mere demonstration, or even threat, to break into a house will not justify a homicide by the occupant. . . .

"The force used by him must be neither greater in degree nor earlier or later in point of time than is necessary or apparently necessary."

In 26 American Jurisprudence 272, section 172, it is said:

"Only in extreme cases can one endanger human life or do great bodily harm in defense of property."

Moreover, the court elsewhere adequately instructed the jury that an assault with a deadly weapon is justifiable when in *necessary* defense of the habitation. Defendant's instruction number 47 charged the jury that the burden was on the prosecution to prove the defendant's unlawful use of a weapon, and

that the burden did not shift "because the defendant claims that he shot Stafford . . . in lawful defense of his property or dwelling." In defendant's instruction number 69, the jury was charged that an assault with a deadly weapon "is also justifiable when committed by any person . . . (2) When committed in defense of habitation." Defendant's instruction number 70 charged the jury that "Resistance sufficient to . . . prevent an illegal attempt by force to take or injure property in his lawful possession," is justifiable.

The defendant's rejected instructions are nearly all too broad and unlimited in their application to the doctrine of justification for the use of force in defense of the habitation. The two which did confine that principle to the *necessary* use of such force were covered by other instructions which were given to the jury.

There is authority which may support the contention that the right to use *necessary* force in defense of the habitation or "castle" also extends to the curtilage which includes the outer buildings, such as bunkhouses. (40 C.J.S. 973, § 109b; 10 W. & P. (perm. ed.), 709.) There is, however, a conflict of authorities as to whether the rule which authorizes necessary defense against threatened injury to the habitation also extends to the curtilage. Certainly the same necessity for defending the habitation and the members of the family therein does not exist to the same extent with respect to remote outbuildings in which no members of the family reside. Moreover, not even the "castle" is entirely exempt from the application of the law. The lord of the manor may not ruthlessly or brutally assault his guest or an employee because, forsooth, he does not like him. If he desires to eject one he may use only the force *necessary* to do so, and that only after fair warning to depart. He is certainly not entitled to use force and violence against one who is not likely to injure or destroy the property. It is apparent that the curtilage is not as sacred in the eyes of the law as is the "castle." But for the protection of neither the habitation nor the curtilage may the owner use more force than is reasonably necessary to prevent imminent damage to the property, even though that person is in fact a trespasser. The rejected instructions made no such distinction. They were therefore erroneous and misleading in that respect, and the court was justified in refusing to give them to the jury.

 There is no merit in the contention that the court erred in refusing to instruct the jury that the defendant had

a right to keep in his house or in his automobile or on his person the rifle with which he shot Stafford. That instruction is misleading for it is not qualified in any respect. Of course, if he had the rifle for the lawful purpose of necessary self-defense or for necessary defense of his property, he had a right to its possession. But the evidence is undisputed that he deliberately armed himself with the rifle when he started to follow Stafford to the bunkhouse. The instruction contained no intimation of the purpose for which he had a right to arm himself with a rifle. The brief fails to assign any reason or authority for stating that the failure to give such an instruction is erroneous. Our attention is not even directed to the number of the instruction or the page where it may be found. Defendant offered 167 instructions. This court is not expected to search the record for an alleged erroneous instruction or to speculate upon an undisclosed reason why an appellant may deem a rejection of an instruction to be erroneous.

 The court did not err in failing to instruct the jury upon the theory that Stafford was shot as the result of an unavoidable accident. There is no substantial evidence of an accidental shooting. The entire defense was founded on the theory of necessary self-defense, and not upon an accidental shooting. The defendant's own testimony was that he deliberately took his rifle with him when he followed Stafford to the bunkhouse. He placed it by his side in the front seat of his automobile. He says that when he started to get out of his machine Stafford said ''Get back in there or I'll shoot you; . . . With that he pulled his gun out of his pocket. . . . I [then] reached for my rifle. . . . I took a couple of steps toward the front end of the car, and he had his automatic out and he was fumbling with the safety on it, and he had it pointed toward me and I said 'Stafford, drop that gun,' and he raised his gun and as he raised it, *I fired the shot.''* (Italics added.) That version of the affray leaves no room for the contention that the defendant accidentally shot Stafford. Clearly it was not an accident in spite of the fact that the defendant said he fired the rifle from his hip and that he did not intend to shoot Stafford, or, as he stated, ''I didn't want to shoot him, I thought more to scare him.'' The defendant was convicted of a mere assault with a deadly weapon under section 245 of the Penal Code. That section provides that ''Every person who commits an assault . . . with a deadly weapon or instrument or by any means or force *likely to produce great bodily injury,''* is guilty of that offense. The *inten-*

*tion* to actually injure another is not mentioned in that section. Section 240 of that code provides that ''An assault is an unlawful attempt, *coupled with a present ability,* to commit a violent injury on the person of another.'' ▮ If a rifle is deliberately and unlawfully fired toward another person in a manner ''likely to produce great bodily injury,'' an assault with a deadly weapon may be accomplished even if the defendant does not really intend to *hit* the victim. It has been held that an assault with a deadly weapon does not ''involve the necessity of proof of any specific intent to commit it.'' (*People* v. *Marseiler,* 70 Cal. 98, 100 [11 P. 503] ; *People* v. *Gordan,* 103 Cal. 568 [37 P. 534] ; *People* v. *Lopez,* 81 Cal.App. 199, 202 [253 P. 169] ; *People* v. *Lim Dum Dong,* 26 Cal.App.2d 135, 140 [78 P.2d 1026].)

▮ Defendant's rejected instruction number 110 was completely covered by other instructions which were given to the jury. For instance, the court directed the jurors that it was their duty to consult with each other ''with a view to reaching an agreement, if you can do so without violence to your individual judgment. You each must decide the case for yourself, but should do so only after a consideration of the case with your fellow jurors.''

Defendant's rejected instruction number 115, with relation to the asserted standard of conduct which would control a ''reasonable person,'' was fully covered by defendant's instructions numbers 107, 112, and several others which were given to the jury.

Defendant's rejected instruction number 82, which asserted that the burden of proof did not shift to the defendant in this criminal action, was covered by defendant's instruction number 47, and others which were given to the jury.

Defendant's rejected instruction number 111, regarding the impeachment of witnesses by evidence of conflicting statements, was also elsewhere covered by the court's charge to the jury. Moreover, the appellant failed to designate any evidence in the record by appropriate reference to the transcript or otherwise, to which that refused instruction may be deemed to apply.

We find no reversible error in the instructions, either given or refused. A careful consideration of all instructions given and refused convinces us that the jury was very fully and fairly charged upon every essential issue presented at the trial.

▮ The court did not unduly limit the cross-examination

of the prosecuting witness Stafford, nor of any other witness. The direct examination of Stafford consumed only 14 pages of the transcript. The cross-examination consumed 150 pages. We are of the opinion the court was extremely indulgent with the defendant in that regard. There is no merit in the contention that the cross-examination of witnesses was unduly restricted. There are instances when a repetition of questions which the court deemed to have been fully answered, were refused, and when the court did request the defendant's attorney to refrain from further questioning of witnesses on particular subjects. We have critically examined each such assigned error, and find no merit in any of them. The chief incident of that nature involved defendant's effort to prove that Stafford was under the influence of liquor Saturday night and the following morning. That evidence was competent, but evidently not of great importance. He admitted that he had been drinking to some extent, but insisted that he was not drunk. Many pages of evidence were adduced on that subject. Mr. Russell, one of defendant's witnesses, said Stafford appeared as though he had been drinking "a little." There was much controversy over the question as to whether a certain bottle of wine came from Stafford's bunkhouse. Several objections to questions on that subject of intoxication were correctly sustained because they were incompetent, or argumentative or unnecessary repetitions of questions which had been answered. Some controversy arose between defendant's attorney and the judge regarding the state of the record. Stafford became vexed and curt. Defendant's attorney seemed rather persistent. The judge was firm in his rulings, but we think he was extremely patient, and courteous. Time and time again he admonished the jury that it must disregard such statements of either counsel or the court, and that they must render their verdict solely on the evidence adduced. Finally, in an urgent effort to pursue the subject of Stafford's intoxication, the court said "I think it is in the record that he was under the influence of liquor at the time of the breakfast." That was a statement favorable to the defendant. The court then sustained an objection to pursuing that subject further. We think that subject was very fully developed. The defendant was not prejudiced by the limitation of cross-examination of Mr. Stafford, or any of the other witnesses.

 The cross-examination of the sheriff, George R. Houx, was not unduly restricted. On the assumption that he was prejudiced in favor of the prosecution, he was asked many

questions as to whether he made an investigation of the previous reputation of Stafford, or as to whether he had been unlawfully carrying a concealed weapon. On several occasions the prosecution charged that the defendant was attempting to discredit witnesses. The case was hotly contested. Considerable zeal was exercised by respective counsel, but we do not criticize that fact. We do not think the court unfairly reproved defendant's attorney for his persistence, or that the jury could have been prejudiced by the remarks of the judge. Certainly the statements of the judge do not constitute reversible error. (*People* v. *McDonald,* 167 Cal. 545, 550 [140 P. 256]; *People* v. *Emmett,* 123 Cal.App. 678 [12 P.2d 92].)

 The limitation of cross-examination of witnesses is within the sound discretion of the trial judge. It is the duty of the trial court to see that a trial is conducted in an orderly and expeditious manner, and to protect witnesses against efforts to intimidate or unfairly discredit them. We find no prejudicial error in those assigned rulings. The court was not guilty of misconduct in that regard, or otherwise.

Numerous other assignments of errors in rulings upon the evidence of half a dozen witnesses are cited and discussed. Defendant was limited in his effort to prove that Stafford had sustained illicit relations with a named woman. That evidence was clearly incompetent. The defendant was not prejudiced by limiting that examination or by striking out certain answers of witnesses with relation thereto. We have critically examined the record upon each assigned error, and find no reversible error in the rulings of the court.

We are convinced the defendant was fairly and impartially tried, and that there was not a miscarriage of justice.

The judgment and the order denying a new trial are affirmed.

Adams, P. J., and Peek, J., concurred.

A petition for a rehearing was denied December 12, 1944, and the following opinion was thereupon rendered:

THE COURT.—On motion for a rehearing appellant's attorney, who did not represent him at the trial of the case, earnestly contends that we have misquoted and omitted important evidence in our opinion. It is claimed our abridgment of testimony in the interest of brevity has resulted in misconstruction of evidence. Many pages of evidence are correctly quoted in the petition, but they merely show a con-

flict of evidence. One quotation of evidence in the opinion is challenged on the ground that it was stricken from the record. But the identical answer of the witness, which was stricken out, was restated by him on the following page of the transcript and remained in the record without objection. That fact was evidently overlooked by the petitioner. On examination we found each challenged quotation of evidence to be supported by the record. The absolute accuracy of the abridgment or interpretation of evidence is always open to argument owing to the inherent infirmity of language to express the exact thought of a witness. · With the object of brevity, we assume a court is not warranted in unnecessarily quoting evidence at great length. We are convinced the opinion correctly construes the evidence in every essential respect. To be sure we have quoted evidence favorable to the support of the verdict, which is the duty of a reviewing court. It is not the province of a reviewing court to weigh evidence or to pass on the credibility of witnesses. The petitioner has apparently overlooked that rule. As an illustration, appellant challenges our statement that Stafford asked permission to get his clothes from the bunkhouse or that the defendant previously threatened to get his gun. On page 376 of the transcript Stafford testified, "I asked him to give me time to get my clothes. . . . He hollered *he would get his gun.*" On the following page Stafford said, "I told him to give me time *to get my clothes.*" Of course Stafford had to go to the bunkhouse to get his clothes. The defendant said at page 694 of the transcript, "I looked north and I seen his car parked in front of the bunkhouse . . . so I went downstairs and got my gun and walked out and got in my car and drove over to the bunkhouse . . . to look after my property."

The evidence indicates that the defendant knew that Stafford had breakfast at the ranch Sunday morning. At page 689 he stated, "I was on the porch by the kitchen. . . . As I was fixing the lunches *I noticed Stafford come out* of the dining room." Mr. Griffin testified that Mr. Corlett "appeared there," in the dining room. Mr. Corlett testified at page 693, "Usually when you fire a man he stays all night and has breakfast the next morning before leaving." He therefore conceded that Stafford was rightfully on the premises according to his own custom, and that he was therefore not a trespasser.

Moreover, the appellant now definitely admits that the evidence is sufficient to support the judgment. We assumed

the defendant challenged the sufficiency of the evidence to support the judgment. It seems inconsistent to challenge alleged inaccuracies of quotations of evidence and at the same time admit that the evidence is sufficient to support the judgment.

The appellant insists that the court failed to pass upon assignments of errors in rulings upon the evidence in the course of the trial "totalling in number some 94 and 95, which were highly prejudicial." We did examine the record with relation to each of those assignments of error and concluded there was no prejudicial error in any of them. We so stated in our opinion. We assume a court is not warranted in extending an opinion to undue length to specifically pass upon 94 separate assignments of that nature, none of which, upon examination, appears to have substantial merit.

The petition for rehearing is denied.

Appellant's petition for a hearing by the Supreme Court was denied December 21, 1944. Carter, J., and Schauer, J., voted for a hearing.