[Crim. No. 51.    Third Appellate District.—October 1, 1907.]

## THE PEOPLE, Respondent, v. STEPHEN A. QUIMBY, Appellant.

CRIMINAL LAW—MURDER—CONVICTION OF SECOND DEGREE—INSTRUCTIONS AS TO FIRST DEGREE NOT PREJUDICIAL—CONSTRUCTION OF CHARGE.—Where a defendant, charged with murder in the first degree, was convicted of murder in the second degree, which is sustained by the evidence, any criticised instructions as to murder in the first degree could not be prejudicial, and an instruction as to murder in the first degree which omits an accurate statement of the law on that subject is to be considered in connection with the entire charge relating thereto, and if, as a whole, it correctly states the law as to murder in the first degree, it is free from error.

ID.—APPLICABILITY OF INSTRUCTIONS—PROVINCE OF COURT AND JURY.—The court may instruct the jury upon any material question upon which there is any evidence deserving of any consideration whatever. It is for the jury to determine what facts are proved by the evidence, and it is the duty of the court to state to them the law by which they are to be governed in the consideration of the evidence.

ID.—BROAD STATEMENT OF LAW—PRESUMED INTELLIGENCE OF JURORS.—
The fact that correct instructions applicable to murder in the first
degree and justifiable homicide stated the law more broadly than
the facts of the case required cannot render them prejudicial. The
jurors must be presumed to be possessed of such a degree of in-
telligence as to enable them to comprehend and understand the per-
tinency of the evidence before them to the court's declaration of
the law.

ID.—EVIDENCE—DECLARATIONS OF DECEASED.—The court did not err in
refusing to admit evidence for the defendant to show declarations
of the deceased, made some time prior to the homicide, that he
"expected to die with his boots on," where the name of the de-
fendant was not used in connection therewith, and the defendant
was not present, and it does not appear that such declaration was
brought to his knowledge.

ID.—MISCONDUCT OF JUROR NOT PREJUDICIAL.—Where a juror violated
the admonition of the court in asking the deputy sheriff having
charge of the jury as to the punishment for manslaughter, to which
the answer was "I don't know," it does not appear that the mis-
conduct of the juror was so prejudicial as to demand a reversal.

ID.—MISCONDUCT OF DISTRICT ATTORNEY—INSTRUCTION—PRESUMPTION.
Where the district attorney made objectionable remarks as to the
presumption that the defendant would have called an available wit-
ness if his testimony would have benefited him, but, upon objection
being raised thereto, the court thereupon instructed the jury to dis-
regard the remarks objected to, it must be presumed that the jury
heeded the ruling of the court, and the misconduct does not de-
mand a reversal of the case.

APPEAL from a judgment of the Superior Court of Mari-
posa County. J. J. Trabucco, Judge.

The facts are stated in the opinion of the court.

John A. Wall, for Appellant.

U. S. Webb, Attorney General, and Charles Jones, for Re-
spondent.

HART, J.—Under an information charging him with the
crime of murder, the appellant was convicted of murder of the
second degree. He appeals from the judgment and an order
denying his motion for a new trial.

The homicide occurred at a small village known as Darrah,
in Mariposa county, on the sixth day of November, 1906, the

day upon which the general election throughout the state was held that year. The polling place at Darrah on that day was in the public school building. The deceased, Richard Smither, had been, prior to the fatal shooting, at the residence of Richard Darrah, having gone there, accompanied by the latter, at about the hour of 11 o'clock A. M. The deceased and Darrah had a few drinks of whisky at the latter's house, and shortly thereafter the former went to the polling place, a distance of about one hundred yards from Darrah's residence. having in his possession a bottle of whisky, a box of cigars and a pocketknife, all of which articles he carried in his hands. Darrah stated that the deceased, while at the former's residence, extracted the cork from a bottle containing whisky by means of the large blade of his pocketknife, and added that "Smither was an expert at pulling out corks with a knife." The bottle taken to the polling place by the deceased was not, however, the bottle from which the deceased had removed the cork at Darrah's house, but was, as Darrah expressed it, "a bottle of whisky that was unopened." Upon reaching the schoolhouse, the deceased met the defendant, and immediately charged him with having shot and killed one of his (deceased's) hogs. The defendant declared the accusation to be baseless, whereupon the deceased, according to the testimony of all the witnesses, with the single exception of that of the defendant, who claimed that the deceased still had the knife in his hand when the blows were struck, threw the box of cigars, the bottle of whisky and the knife to the ground, and, approaching the defendant, struck him one or two blows about the face. The defendant, upon being struck by deceased, either stepped or was forced back a few feet by the impact of the blows from the deceased, and almost concurrently with that movement drew a revolver from his pocket and fired at and mortally wounded Smither, who expired shortly after the infliction of the wound. These are, substantially, the facts leading to and attending the commission of the homicide as established at the trial.

The appellant complains of certain instructions given to the jury by the court, of rulings rejecting certain proffered testimony and of alleged misconduct of the jury. It is also claimed that the appellant suffered serious and, therefore, prejudicial injury from certain alleged improper remarks of the district attorney during the course of his argument.

1. The objections urged against that portion of the court's
charge to the jury bearing upon the two degrees of murder
and upon justifiable homicide are founded upon the contention
that there is no evidence in the record to which such instruc-
tions are pertinent. This position necessarily involves the
claim that the evidence adduced at the trial is insufficient to
justify the verdict. While an examination of the record has
resulted in the disclosure of no reason for warranting a doubt
of the pertinency of the instructions given by the court
bearing upon the two degrees of murder, the criticism of such
of the instructions as define murder of the first degree and the
various elements of which, according to circumstances, it may
consist, could be passed without consideration, since such in-
structions in any event could not have injured the defendant
in view of the fact that the jury returned a verdict adjudging
him guilty of the lesser of the two degrees of the crime
charged. But counsel for appellant concedes that the instruc-
tions given to the jury upon both the degrees of murder cor-
rectly declare the law applicable thereto, if the evidence es-
tablished facts which would sustain a conclusion by the jury
that the defendant was guilty of either of the two degrees of
murder. We think the evidence, as disclosed by the record
before us, justified the giving of the criticised instructions.
There is no conflict in the evidence, except, as we have seen,
such as arises from the testimony of the defendant himself,
upon the point that the deceased, before assaulting the defend-
ant, cast to the ground the knife which he held in his hand
at the time he first accosted the defendant and accused him
of killing the hog. Some five or six witnesses, who testified
to having seen the whole difficulty, from its beginning to the
time of the firing of the shot, declared that the deceased threw
the knife to the ground before striking the defendant. There
is, it is true, some variance between the witnesses as to the
time at which the knife was picked up from the ground by one
Monroe Eubanks, a witness to the shooting. Most of the
witnesses testified that the knife was picked up before the
deceased struck the defendant, while Eubanks himself stated
that he did not take possession of the knife until after Smither
had been shot. Obviously, of course, the importance of the
circumstance as to the point of time with reference to the
shooting—whether prior or subsequently thereto—at which the
knife was picked up lay in the influence it might exercise in

the determination of the question by the jury of whether the deceased did or did not have the knife in his hand when he assaulted the defendant, the claim of the latter being that he was so attacked by the deceased. There was, however, other evidence which rendered appropriate the instructions complained of. John Lewis, a witness for the people, testified, in part, as follows: ". . . I saw Mr. Smither set or drop the box of cigars down; when he raised up or straightened up he made a run at Mr. Quimby and he struck with his right and left hand and Mr. Quimby kind of had his hand up some way that way. I don't know exactly how it was. He (Smither) struck at him a couple or three times, then Smither stepped back, then turned and walked like he was going to pick up the cigars, three or four steps, then he turned round facing Mr. Quimby and at the same time Mr. Quimby took a step like that and got his six-shooter out in his hand and then he shot with his right hand." It will thus be seen that, according to Lewis, the deceased, after striking the defendant, turned his back to and left the latter, going in the direction of the spot where he had placed the cigars; that the defendant shot Smither after the latter had desisted from further combat. It is true, as seen, that the defendant claimed that the deceased, after the altercation, rushed toward him threateningly with an open knife in his hand, and fearing injury or perhaps death at his hands, he shot the deceased in self-defense; but the character of the court's instructions was not to be determined alone by the defendant's testimony; or, for that matter, by the testimony of any other single witness. It is elementary that the court may instruct a jury upon any material question upon which there is any evidence deserving of any consideration whatever, for it is with the jury to determine what facts are proven by the evidence, and it is the duty of the court to state to them the law by which they are to be governed in their consideration of such evidence. We think there is no room for doubt that the evidence before us was and is sufficient to uphold the verdict.

In addition to the facts to which we have specifically adverted, it is important to bear in mind that it appears quite clear that the deceased had the open knife in his hand from the time he left Darrah's residence until he dropped it to the ground prior to striking the defendant. It is also, in this connection, a fact of potent significance that the defendant

himself testified that he was uninjured by the blows received from the deceased. But the appellant declares that that part of the court's charge relating to murder committed under the circumstances mentioned in section 189 of the Penal Code was clearly erroneous, because there was no evidence in the record upon which such an instruction could be properly predicated. It is true that the defendant was not accused of having caused the death of Smither by means of poison, lying in wait, etc., nor is there any pretense that the crime was committed while the slayer was engaged in the perpetration or attempt to perpetrate any of the crimes enumerated in said section; yet we see nothing improper in the court's action in elucidating and explaining to the jury the multifarious forms in which, according to the varying circumstances under which human life may be taken with the malice as known and understood in its legal sense and nomenclature, murder may present itself. The jurors must be presumed to be possessed of such a degree of intelligence as to enable them to comprehend and understand the pertinency to the evidence of the court's declaration of the law, and that, under the evidence, their verdict could not be founded upon any consideration of the elements constituting the kinds of murder referred to in section 189, *supra*, within which the act of the defendant, if murder at all, could not, of course, by any possibility, be brought. The legislature has said that murder committed under the circumstances contemplated by that section is murder of the first degree, and as to the other kinds of murder, whether they be of the first or of the second degree must be determined by the jury itself from all the circumstances by and under which the act was committed. And we, therefore, think it was proper for the court to explain to the jury all the circumstances under which a homicide might be murder of the first degree, so as thus to invest the triers with full knowledge of the law upon the subject and thereby the better enable them to apply it to the particular facts of the case before them. Besides, as we have already observed, as the verdict was of murder of the second degree, the instruction could not in any view have done the appellant injury.

It is urged that the court went too far in its instruction upon the question of justifiable homicide. These instructions covered the entire field of the law upon the subject, involving

a full exposition of the occasions upon which, under the provisions of our Penal Code, the taking of human life would be justified. While all the different circumstances under which homicide is justifiable are not present in the case at bar, we can perceive no harm which could have resulted to the defendant by the giving of the instructions to which objection is made. In telling the jury what circumstances would excuse or justify the act of a person in taking human life, the court declared the law which applied to the theory upon which the defendant presented his case—that the killing was in necessary self-defense. The instruction was given in the exact language. of section 197 of the Penal Code, and contains, therefore, a correct statement of the law generally upon justifiable homicide. Besides, the court, in instructions requested by the appellant, declared to the jury the law concretely upon this subject and in conformity with the hypothesis of self-defense as contended for by the defendant.

Appellant also insists that the following language of one of the given instructions was prejudicially erroneous: ". . . or the circumstances of the killing show an abandoned heart, this is murder of the second degree, unless the evidence proves the existence in the mind of the slayer of the specific intent to take life. If such specific intent exists at the time of such unlawful killing, the offense committed would of course be murder of the first degree." This instruction, it is obvious, does not contain an accurate statement of the law upon murder of the first degree, nor do we think the quoted language as an instruction is warranted by anything that is said in the cases upon which it is claimed that it is founded. (See *People* v. *Doyell,* 48 Cal. 96; *Ex parte Wolff,* 57 Cal. 94.) But in determining whether or not an erroneous instruction operated prejudicially to the defendant, the entire charge of the court must be considered, "and if, as a whole, it correctly states the law, it is free from error, notwithstanding selected passages may state a proposition without at the same time and in immediate connection stating the exceptions or qualifications to which it is subject in its application in the case in hand." (*People* v. *Mendenhall,* 135 Cal. 346, [67 Pac. 325]. See, also, *People* v. *Doyell,* 48 Cal. 85; *People* v. *Flynn,* 73 Cal. 511, [15 Pac. 102]; *People* v. *Worden,* 113 Cal. 569, [45 Pac. 844].) In other parts of the charge the court clearly

and explicitly and accurately defined the malice essential to the consummation of either of the degrees of that crime. The instructions, taken and viewed in their entirety, presented, we think, the case fully, clearly and correctly. Moreover, as heretofore stated with reference to other instructions, the pertinency of which is challenged, the verdict of the jury furnishes evidence quite conclusive that the instruction containing the quoted language was harmless.

The attack upon the instruction in which the court explained the various forms of verdict, any one of which the jury could adopt according to the conclusion reached by it under the evidence, is barren of meritorious foundation. We think, as we have already indicated, that the evidence was sufficient to warrant any verdict which the jury might have been persuaded to reach, and that, consequently, the instruction does not, as counsel urges, "assume the existence of evidence that had not been offered in the case."

2. The court did not err in refusing to permit the witness Hart to testify, on behalf of the defendant, to certain declarations, alleged to have been made by the decedent some time prior to the date of the homicide. It was sought to be established through this witness that Smither, at Hart's store, in the presence of said witness and others, on some occasion preceding the day upon which the shooting occurred, declared that he expected to "die with his boots on." The witness stated that the name of the defendant was not mentioned by the deceased in connection with said declaration, nor was the defendant present when it was uttered. The declaration does not appear to have been directed to any particular person, nor does it appear that the defendant had any knowledge at the time of the shooting of its having been made by the deceased. The testimony thus attempted to be elicited from the witness was not competent for any purpose.

3. After the jury retired for the purpose of deliberating upon the case, juror Peterson asked the deputy sheriff (Paine) having charge of the jury what punishment the law prescribed for manslaughter. As to the exact language with which the deputy sheriff clothed his reply to the question there is some conflict between counsel for defendant in his affidavit and the deputy sheriff and one Lind, who was with Paine at the time the juror asked the question. Paine and

Lind state that ·the conversation was as follows: Peterson: "What is the penalty for manslaughter?" to which Paine replied, "I don't know." Peterson: "I think it is from one to ten years." Paine: "Maybe it is, but I don't know." The affidavit of counsel for appellant states that Paine's answer to the last question was "substantially" as follows: "I think so, but I don't know." The court below, in passing upon the facts thus presented upon the alleged misconduct, evidently accepted the statements of Paine and Lind of what occurred. It is also apparent from the use of the word "substantially" by counsel for appellant in describing Paine's answer that counsel himself was not certain and definite as to what was actually said by Paine in reply to the juror. Taking the version of what transpired as given by Paine and Lind, it is manifest that the alleged misconduct could not have produced prejudicial harm to appellant. The juror himself seemed to be better informed as to the penalty prescribed for manslaughter than the officer. Besides, the juror received no information from the officer. It is not pretended that the evidence was discussed by Peterson and Paine. While the juror, as is too often the case, grossly violated the admonition of the court against talking about the case with persons other than his compeers upon the jury, we cannot, as already suggested, perceive anything in his conduct militating against the substantial rights of appellant, or warranting a reversal of the case.

4. It is charged that the district attorney, during the course of his address to the jury, transcended the record and made remarks concerning matters foreign to the case. The district attorney was discussing certain language which it was claimed was used by the deceased while the altercation between the defendant and the former was in progress, and expressed a doubt as to whether the deceased, addressing the defendant, used the word "retaliate." That officer then proceeded to say: "While there were a great many people around and in that neighborhood but few seem to know anything of the conversation. Only one man has been testified to that might know and that was Eli Revel; he is not a witness or was not a witness. I did not know the relevancy of his testimony or I would have had him here, and it is only fair to presume that his testimony would not benefit the defendant or the de-

fendant would have him here— '' At this point counsel for
the defendant interposed an objection to the remarks of the
district attorney upon the ground that they constituted mis-
conduct. The court thereupon instructed the jury in clear
and emphatic language that it was their duty to disregard the
remarks objected to, and at the same time stated that ''the
personal views and opinions of counsel, if any were expressed,
must have no place in your deliberations; counsel have no
right to offer them to you and you must not be swayed
or guided in any way by such statement.'' We do not think
the remarks of the district attorney, though altogether un-
justifiable, are such as to demand a reversal of the case.
The court, as seen, was prompt and clear in instructing the
jury to disregard the remarks, and we must assume that the
triers paid due heed to the instruction. In most of the cases
in this and other jurisdictions, in which reversals have been
asked upon the ground of misconduct of the prosecuting at-
torney based upon improper remarks addressed to the jury,
it has been held that it is only where the misconduct has been
called to the attention of the trial court and said court has
refused to instruct the jury to disregard the remarks that
a reversal will be ordered upon that ground. We are not,
however, to be understood as holding that there might not be
misconduct upon the part of the state's attorney in his ad-
dress to the jury which the instruction of the court would
not cure. But the case at bar comes within the rulings in
*People* v. *Benc,* 130 Cal. 165, [62 Pac. 404] ; *People* v. *Smith,*
134 Cal. 457, [66 Pac. 669] ; *People* v. *Fitts,* 3 Cal. App. 432,
[91 Pac. 536] ; *People* v. *Yee Foo,* 3 Cal. App. 730, [89 Pac.
450].

We find no error in the record demanding a reversal. The
judgment and order are affirmed.

Chipman, P. J., and Burnett, J., concurred.

A petition for a rehearing of this cause was denied by the
district court of appeal on October 30, 1907, and the fol-
lowing opinion was then rendered thereon :

HART, J.—A careful consideration of the points discussed
in the petition for a rehearing has developed no reason for

a modification of the views expressed in the main opinion upon said points.

A rehearing is, therefore, denied.

Chipman, P. J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on November 29, 1907.