[Crim. No. 5152. In Bank. Mar. 1, 1951.]

THE PEOPLE, Respondent, v. RAYNA TOM CARMEN, Appellant.

Mason A. Bailey for Appellant.

Fred N. Howser, Attorney General, and Doris H. Maier, Deputy Attorney General, for Respondent.

CARTER, J.—Defendant was convicted of first degree murder and assault with intent to commit murder. The punishment was not fixed by the jury. The hearing on his plea of not guilty by reason of insanity resulted in his being found sane by the jury. Judgment was thereupon pronounced imposing the death penalty as punishment for the crime charged in count one and imprisonment in the state prison for the term prescribed by law as punishment for the crime charged in count two. A motion for a new trial as to both counts was made and denied. An appeal comes automatically to this court from the judgment and order denying the motion for a new trial on both counts.

The victim of the killing was Wilbur, also called Murphy McSwain, and the victim of the assault was Alvin, also called Scotty McSwain, a brother of Wilbur.

On Saturday afternoon, April 22, 1950, shortly after 6 o'clock, defendant, a man 39 years of age, casually encountered Mrs. Ella McSwain, Wilbur's mother, Josephine Davis, Ella's cousin, and Alvin McSwain, all lifelong acquaintances, at the town of North Fork in Madera County. At Josephine's request defendant drove the group in his car to the McSwain home a few miles from North Fork. After spending a short time at the McSwain home the women requested that they ride with defendant to Yosemite Forks, that being his destination. Henry Chenot joined the group and they went to Yosemite Forks where they attended a dance. Wilbur McSwain was

also at the dance. Nothing unusual happened at the dance. The dance ended about 2 in the morning and many of those attending, including the above mentioned persons, went to a place known as Kilroy's Stand, where soft drinks and sandwiches were sold. According to the People's evidence, defendant was there boasting that the Army was better than the Marine Corps and that he was an ex-soldier. Josephine Davis replied that there were a lot of ex-servicemen. Defendant slapped her in the face, and Henry Chenot, Alvin and Wilbur McSwain and others came to the rescue. They pushed defendant to the ground and told him to behave himself. He was allowed to get up and left for his home alone, some 35 to 40 miles away. When leaving he threatened to kill all of them, the whole "bunch," the whole family; that he was going home to get his gun and kill them. In various words seven witnesses who were present at Kilroy's Stand testified to the threat. Witnesses also testified that defendant was not struck in the altercation, and that while he seemed angry when he left, he was otherwise all right. Defendant drove to his home over a winding mountain road (35 to 40 miles away), obtained a rifle and ammunition and proceeded to the McSwain home. He reached the latter one to two hours after having left Kilroy's Stand. He parked his car beside the road about one quarter of a mile from the McSwain home, although there was available a road going to their place which he had used earlier in the day. He left his car, taking his gun which was loaded with a cartridge in the firing chamber. He walked down a pole line rather than the road to the McSwain house. Finding no one there he sat on the porch to wait for them. After about 10 minutes he heard a car drive up. He got up from the porch and in so doing accidentally discharged the rifle. He approached the car on its left side. In it were Marion Donnell and Wilbur McSwain in the front seat and Alvin McSwain and Ted Davis in the back seat. He said he was going to kill all of them except Donnell. The latter remonstrated with him and was told to "stay out of it" or he would be killed. Donnell was on the left side of the front seat. Defendant aimed the gun at those in the front seat and fired, the bullet going behind Donnell's head and striking Wilbur who was then standing by the right front door. Wilbur later died from the wound. He then walked to the back of the car, pointed the rifle into it, and shot three times, inflicting three wounds on Alvin. He was then disarmed by those present and was later taken into custody.

Defendant does not dispute the shooting. In other particulars, however, his story varies with the prosecution's case. He testified that he did not slap Josephine at Kilroy's Stand; he merely patted her "playfully" on the face endeavoring to quiet her, she being in an upset condition; that he was struck in the face thereafter and his teeth knocked out; that he suffered severe pain in his head all the time thereafter until and after he was taken into custody; that he does not remember making threats at Kilroy's Stand; that he went to the McSwain home to find out what the trouble was all about and to see what, if anything, he had done wrong. After leaving the porch at the McSwain home and the accidental discharge of the gun, he stepped in a hole while approaching the car and stumbled. When he recovered his balance the rifle came up in a firing position and discharged (the shot that killed Wilbur). He was merely shooting at the car when he wounded Alvin McSwain. He did not say anything prior to or at the time of the shooting. He did not intend to kill or injure anyone. He also testified that he did not remember much of what happened and did not know what he was doing. There is evidence that he purchased a bottle of whiskey and drank some of it in the course of the evening and also drank some beer, but none that he was intoxicated. An officer to whom he made a statement testified that defendant said he fired the gun, not pointing at anyone but just to scare the McSwains.

There is no contention that the evidence was insufficient to support the conviction of first degree murder and it is clearly ample. Defendant urges that the court erred in refusing to give the jury instructions on manslaughter. The court remarked during the argument to the jury that it would give no such instructions and refused the following instruction offered by defendant: "Manslaughter is the unlawful killing of a human being without malice. Two kinds of manslaughter, the definitions of which are pertinent in this case, are:

"1. Voluntary manslaughter, which is that committed upon a sudden quarrel or heat of passion.

"2. Involuntary manslaughter, which is that done in the commission of an unlawful act not amounting to a felony, or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." The prosecution also offered instructions on manslaughter but the trial judge refused to give them.

It is a settled rule that jury instructions must be responsive to the issues. The issues in a criminal case are

determined by the evidence. Here there was evidence which raised the issue of manslaughter. No instructions were given on this issue, although they were requested by both sides. Section 1127 of the Penal Code provides: "... *The court shall inform the jury in all cases that the jurors are the exclusive judges of all questions of fact submitted to them and of the credibility of the witnesses.*" (Emphasis added.) It has been held that a defendant is entitled to instructions on his theory of the case as disclosed by the evidence, no matter how weak. ██ As so ably stated in *People* v. *Burns,* 88 Cal.App.2d 867, 871 [200 P.2d 134], with ample citation of authority: "It is *elementary* that the court should instruct the jury upon every material question upon which there *is any evidence deserving of any consideration whatever.* (*People* v. *Quimby,* 6 Cal.App. 482, 486 [92 P. 493] ; *People* v. *Foster,* 79 Cal.App. 328, 337 [249 P. 231] ; *People* v. *Hill,* 76 Cal. App.2d 330, 343 [173 P.2d 26].) ██ *The fact that the evidence may not be of a character to inspire belief does not authorize the refusal of an instruction based thereon.* (*People* v. *Perkins,* 75 Cal.App.2d 875, 881 [171 P.2d 919] ; *People* v. *Peete,* 54 Cal.App. 333, 356, 359 [202 P. 51] ; *People* v. *Wong Hing,* 176 Cal. 699, 705-706 [169 P. 357].) *That is a question within the exclusive province of the jury. However incredible the testimony of a defendant may be he is entitled to an instruction based upon the hypothesis that it is entirely true.* (*People* v. *Perkins, supra,* p. 881; *People* v. *Williamson,* 6 Cal. App. 336, 339 [92 P. 313] ; *People* v. *Keefer,* 65 Cal. 232, 234 [3 P. 818].) ██ It is the duty of the court to instruct the jury in regard to any included offense which the evidence tends to prove. (*People* v. *Stofer,* 3 Cal.App. 416, 418 [86 P. 734] ; *People* v. *Carroll,* 20 Cal.App. 41, 45 [128 P. 4] ; *People* v. *Wilson,* 29 Cal.App. 563, 564 [156 P. 377] ; *People* v. *Mock Ming Fat,* 82 Cal.App. 618 [256 P. 270] ; *People* v. *Driscoll,* 53 Cal.App.2d 590, 593 [128 P.2d 382].) ██ In *People* v. *Carroll, supra,* the court said (p. 45) : 'It is undoubtedly the rule that, where there is *any* evidence from which a reasonable inference may be drawn that the crime of which the defendant was convicted was of a lesser degree ... it is *prejudicial* error to withdraw from the jury the consideration of such evidence and confine the instructions to the crime [charged].' '' (Emphasis added.)

██ It has been repeatedly held that it is reversible error to refuse a manslaughter instruction in a case where murder

is charged, and the evidence would warrant a conviction of manslaughter. (*People* v. *Wilson*, 29 Cal.App. 563 [156 P. 377]; *People* v. *Hayes*, 9 Cal.App. 301 [99 P. 386]; *People* v. *Sidelinger*, 9 Cal.App. 298 [99 P. 390]; *People* v. *Darrow*, 212 Cal. 167 [298 P. 1]; *People* v. *Wallace*, 2 Cal.App.2d 238 [37 P.2d 1053]; *People* v. *Best*, 13 Cal.App.2d 606 [57 P.2d 168].)

It is said in *People* v. *Hayes*, 9 Cal.App. 301, 305 [99 P. 386], quoting from *Stevenson* v. *United States*, 162 U.S. 313 [16 S.Ct. 839, 40 L.Ed. 980]: ''In the Stevenson case the judgment was reversed solely for the reason that the trial court refused to submit to the jury the issue of manslaughter. The language of the court, speaking through Justice Peckham, is exceedingly appropriate to the matter before us. It was there said: 'The evidence as to manslaughter need not be uncontradicted or in any way conclusive upon the question; so long as there is some evidence upon the subject, the proper weight to be given it is for the jury to determine. If there were any evidence which tended to show such a state of facts as might bring the crime within the grade of manslaughter, it then became a proper question for the jury to say whether the evidence were true, and whether it showed that the crime was manslaughter instead of murder. It is difficult to think of a case of killing by shooting, where both men were armed and both in readiness to shoot, and where both did shoot, that the question would not arise for the jury to answer, whether the killing was murder or manslaughter, or a pure act of self-defense. The evidence might appear to the court to be simply overwhelming to show that the killing was in fact murder, and not manslaughter or an act performed in self-defense, and yet, so long as there was some evidence relevant to the issue of manslaughter, the credibility and force of such evidence must be for the jury, and cannot be matter of law for the decision of the court.' ''

█ Taking the view defendant expressed to the officer who took a statement from him that he shot to frighten the McSwain boys but had no intention of killing or injuring anyone and did not aim at them, the jury could have found defendant guilty of involuntary manslaughter. As said in *People* v. *McGee*, 31 Cal.2d 229, 238 [187 P.2d 706]: ''If defendant, as he testified, discharged the pistol with intent only to frighten, and not to shot deceased, and such act was not done in the exercise of defendant's right of self-defense, he could be found guilty of involuntary manslaughter.'' In such

shooting he might be committing an unlawful act, but it would not amount to a felony. The basis of that statement is that one type of involuntary manslaughter is a killing "in the commission of an unlawful act, not amounting to felony." (Pen. Code, § 192(2).) If the act committed by defendant was unlawful but did not amount to a felony then his crime would be manslaughter. The unlawful act would fall short of assault with a deadly weapon (Pen. Code, § 245), or even assault (Pen. Code, § 240), if the jury chose to believe his testimony that he had no intent to kill or injure anyone. This follows from the definition of an assault as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (Pen. Code, § 240.) One could not very well "attempt" or try to "commit" an injury on the person of another if he had no intent to cause any injury to such other person. Assault with a deadly weapon is nothing more than an assault where there is used either a deadly weapon or any means of force likely to produce "great" bodily injury. (Pen. Code, § 245.) The crime here involved, if defendant's testimony is accepted as true, would seem to be a misdemeanor. "Every person who, except in self-defense, in the presence of any other person, draws or exhibits any firearm, whether loaded or unloaded, or any other deadly weapon whatsoever, in a rude, angry or threatening manner, or who in any manner, unlawfully uses the same in any fight or quarrel is guilty of a misdemeanor." (Pen. Code, § 417.)

It has been held that "If the act is wrongful and the firing of a gun under the circumstances is unlawful, the intent may be inferred from the method used, including the position of the parties and all of the surrounding circumstances. 'Where the act is both unlawful and wrongful, and well calculated to inflict serious personal injury, the law will imply malice and an unlawful intention and override any actual intention existing in the mind of the aggressor. Thus, while it is not an assault to fire a gun in the air for the purpose of frightening another, it is an assault, *without regard to the aggressor's intention*, to fire a gun at another or in the direction in which he is standing. The law will not tolerate such a reckless disregard of human life.' " (*People* v. *Peak*, 66 Cal.App.2d 894, 901 [153 P.2d 464].) (See, also, *People* v. *Corlett*, 67 Cal.App.2d 33 [153 P.2d 595, 964]; *People* v. *Bumbaugh*, 48 Cal.App.2d 791 [120 P.2d 703].) ▮ But as seen from the foregoing discussion, those cases fly in the face of the wording

of sections 240 and 245 of the Penal Code and *People* v. *McGee, supra*. It is true that in assault cases intent need not be specific—to cause any particular injury and it may be implied from the act (*People* v. *McCoy*, 25 Cal.2d 177 [153 P.2d 315]), but the intent is a question for the jury. If the above quoted statement from the Peak case is accepted as the law of this state, it would always be second degree murder when a person kills another with no intent to do so, but does so as the result of his reckless conduct. It may be that an intent can be inferred from such conduct but it also may constitute manslaughter, as a killing in the "commission of a lawful act which might produce death . . . without due caution and circumspection." (Pen. Code, § 192(2).)

█ Accepting defendant's testimony that he stumbled, and the gun went off, and that he did not intend to shoot or injure anyone, yet he was carrying the gun with a cartridge in the firing chamber, with the gun pointed forward, and approaching a car occupied by persons, the jury would have been justified in concluding that he did not act with "due caution and circumspection." A killing is manslaughter where it is done in the commission "of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (Pen. Code, § 192(2).) It has been held repeatedly that a killing resulting from the negligent handling of firearms may be manslaughter. (*People* v. *Searle*, 33 Cal.App. 228 [164 P. 819]; *People* v. *Hubbard*, 64 Cal.App. 27 [220 P. 315]; *People* v. *Attema*, 75 Cal.App. 642 [243 P. 461]; *People* v. *Sidwell*, 29 Cal.App. 12 [154 P. 290]; *People* v. *Sica*, 76 Cal.App. 648 [245 P. 461].) Under some circumstances a claim supported by evidence that the killing was accidental will not justify an instruction on manslaughter, for the defendant is either guilty of murder or not guilty of any crime. (See *People* v. *Eggers*, 30 Cal.2d 676 [185 P.2d 1].) But here, as above shown, the jury could have found defendant guilty of manslaughter on the ground that the "accident" was the result of his negligence.

█ Defendant's defense, as seen, would not exonerate him completely, but if believed, *he could not be found guilty of either first or second degree murder*. Thus, the jury, if it believed defendant's evidence, could find that he had committed an offense which was neither first nor second degree murder, but a lesser public offense—manslaughter. Under the instructions, however, it could not find him guilty of that

lesser offense. It had to find him guilty of murder (first or second degree) or acquit him.

The cases relied upon by the People are not controlling. In *People* v. *Mandell,* 48 Cal.App.2d 806 [120 P.2d. 921], *People* v. *Alcalde,* 24 Cal.2d 177 [148 P.2d 627], *People* v. *LaVers,* 130 Cal.App. 708 [20 P.2d 967], *People* v. *Du Bois,* 16 Cal.App.2d 81 [60 P.2d 190], *People* v. *Gibson,* 92 Cal. App.2d 55 [206 P.2d 375], and *People* v. *Danielly,* 33 Cal.2d 362 [202 P.2d 18], there was no evidence upon which a manslaughter conviction could be based (defendant was guilty of murder or not guilty) and thus an instruction on the subject of manslaughter would not be proper. *People* v. *Manzo,* 9 Cal.2d 594 [72 P.2d 119], held that words could not constitute provocation sufficient to reduce the offense to manslaughter, but was overruled by *People* v. *Valentine,* 28 Cal.2d 121 [169 P.2d 1].

Defendant rests his claim for a manslaughter instruction on the basis of a voluntary killing in the heat of passion. By reason of the result reached that point need not be discussed. He probably was not entitled to such an instruction because he positively testified that he did not intend to kill or injure anyone, thus it was not a voluntary killing. He said he went to the McSwain home to see what he had done wrong—no anger or passion was suggested.

In addition to the error in failing to instruct on the subject of involuntary manslaughter, the court erred in giving the following instruction: "There need be, however, no considerable space of time devoted to deliberation or between the formation of the intent to kill and the act of killing. It is only necessary that the act of killing be preceded by, and be the result of a concurrence of will, deliberation and premeditation on the part of the slayer to constitute murder in the first degree, regardless of how rapidly or slowly these mental processes succeed each other or how quickly or tardily they are followed by the act of killing," and in refusing to give an instruction offered by defendant defining "deliberate" and "premeditated" as set forth in *People* v. *Bender,* 27 Cal.2d 164, 183 [163 P.2d 8]. The word "considerable," used as an adjective, means "Worthy of consideration; of importance or consequence." (Webster's New Inter. Dict. (1943).) The instruction as given leaves no ground for the classification of murder of the second degree. (*People* v. *Honeycutt,* 29 Cal.2d 52, 60 [172 P.2d 698]; *People* v. *Bender, supra,* 182-185; see, also, *People* v. *Valentine,* 28 Cal.2d 121,

134 [169 P.2d 1].) ▮▮▮ While the court correctly instructed the jury as follows: ''The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with different individuals and under varying circumstances. The true test is not the duration of time, but rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it include an intent to kill, is not such deliberation and premeditation as will fix an unlawful killing as murder of the first degree. To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, decide to and commit the unlawful act causing death,'' such instruction, under the circumstances, does no more than create a conflict with the incorrect instruction and we cannot speculate on which of the conflicting instructions the jury followed. (*People* v. *Dail,* 22 Cal.2d 642, 653 [140 P.2d 828]; *People* v. *Honeycutt, supra.*)

▮▮▮ He was prejudiced, asserts defendant, by the failure of the officers to permit him to examine the statement given by him to them after it was transcribed. He was told the statement would be typed and he would be given an opportunity to examine it and requested to sign it. Neither was done. While defendant stated that at the time he gave the statement he was suffering severe pain in his head and was confused, there is ample evidence that he was not acting under duress, and he was fully advised of his rights. Defendant is in no position to assert that in giving his statement he relied upon a promise that the statement would be transcribed and he could examine it, as the claimed ''promise'' was made *at the conclusion* of the questioning. We are not referred to any authority that extrajudicial statements made by one accused of a crime must be transcribed and examined by the accused before they are admissible in evidence. ▮▮▮ The weight of defendant's replies to the questions put to him in the light of his claimed confusion and physical condition was for the jury.

Finally, defendant argues that there was insufficient evidence that he ''wilfully, unlawfully, feloniously and with malice aforethought'' and intentionally assaulted Alvin Mc-

Swain with the intent to murder him. He refers to his testimony that he had no intent to kill or injure anyone and did not point the gun at Alvin. There is ample evidence as heretofore outlined to sustain the conviction of assault with the intent to commit murder.

There is no inconsistency in an affirmance of that conviction and a reversal of the murder count because there was no negligence claimed in the shooting of Alvin. There is ample evidence that it was intentional.

No claim is made of any error in the insanity phase of the trial. It appears that defendant was confined to a state mental hospital for six years, ending over 10 years ago, with an initial diagnosis of dementia praecox, later changed to traumatic psychosis, apparently caused by a skull fracture. Defendant testified but produced no medical witnesses. Four qualified doctors testified that defendant was sane when the killing and assault took place.

The judgment and order denying a new trial on the first count (first degree murder) are reversed. The judgment and order denying a new trial on the second count (assault with intent to commit murder) are affirmed.

Gibson, C. J., Traynor, J., and Schauer, J., concurred.

SPENCE, J.—I concur in the affirmance of the judgment of conviction and the order denying a new trial as to the second count, which charged defendant with an assault with intent to commit the murder of Alvin McSwain. I dissent, however, from the reversal of the judgment and the order denying a new trial as to the first count, which charged defendant with the murder of Wilbur McSwain.

The majority opinion bases the reversal of the judgment as to the first count upon alleged prejudicial error (1) in refusing to give an instruction upon involuntary manslaughter and (2) in giving and refusing to give certain instructions relating to first and second degree murder. In my opinion, a review of the record, including the evidence, shows that defendant was accorded a fair trial, and that the trial court committed no prejudicial error which would warrant a reversal of the judgment as to either count.

It must be remembered that since 1914, a reversal may not be based upon mere error in instructing the jury "unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error com-

plained of has resulted in a miscarriage of justice.'' (Const., art. VI, § 4½.) As was said in *People* v. *Watts*, 198 Cal. 776, at page 793 [247 P. 884] : ''Since the adoption of section 4½ it no longer is the rule in this state that injury is presumed from error. Before the reversal of a judgment of conviction may be had it must affirmatively appear to the satisfaction of this court, after an examination of the entire cause, including the evidence, that the accused may well have been substantially injured by the error of which he complains.''

The cited constitutional provision places a heavy duty upon this court, in that our task does not end with the determination that some error may have crept into the lengthy proceedings in the trial court. If this court determines that any error occurred, it is then confronted with the equally important task of weighing the possible prejudice of that error in the light of the situation shown by the entire record. The duty thus cast upon this court is a grave one, and more particularly in a case where a human life is at stake; but a review of the record here convinces me that the only error committed was in the failure of the trial court to give an instruction on involuntary manslaughter, and such error was not prejudicial for the reasons hereinafter set forth.

The first observation to be made, after reviewing the entire record, is that the overwhelming evidence points unerringly to the commission by defendant of the cold-blooded, carefully planned, and premeditated murder of Wilbur McSwain; and similarly, to the commission of a deliberate assault with the intent to murder Alvin McSwain. Numerous witnesses testified to the threats to ''kill the whole family'' made by defendant long before the crimes were committed, as well as to like threats made immediately prior to the actual commission of the offenses. The evidence covering the admitted acts of defendant in the long period of time intervening between the first threats and the subsequent firing of several shots at his victims, and his admitted acts at the time of the shooting, furnishes corroboration to the point of demonstration of defendant's deliberate plan and purpose to kill his threatened victims.

As against this overwhelming testimony indicating defendant's guilt of the offenses of which he stands convicted, the record discloses that defendant gave conflicting versions of what occurred. To the officers following his arrest, he admitted that all the shots were fired intentionally but ''just to scare the people.'' Before the jury, he testified that the

fatal shot which killed Wilbur McSwain was fired accidentally rather than intentionally, and that while he intentionally aimed the other shots at the car, he did not intend to kill or injure anyone.

Turning now to the claimed error in giving and refusing instructions, attention will first be directed to the instructions relating to murder.

### The Instructions Relating to Murder

It is elementary that the instructions must be considered as a whole, and that "Whether a jury has been correctly instructed is not to be determined from a consideration of parts of an instruction or from particular instructions, but from the entire charge of the court." (8 Cal.Jur. 631, § 607 and cases cited.) It is therefore clear that error may not be predicated upon a single sentence or paragraph of an instruction when read out of context. (*People* v. *Frazier,* 88 Cal.App. 2d 99, 105 [198 P.2d 325].) Only a small portion of the instructions relating to murder is quoted in the majority opinion, and while it appears unnecessary to set forth in its entirety the trial court's very extensive charge on this subject, sufficient should be quoted to show that error may not be predicated upon the portion criticized by the majority.

The trial court fully instructed the jury upon the statutory definition of murder (Pen. Code, § 187) and the degrees of murder (Pen. Code, § 189), and expanded upon those definitions in the following manner:

"All murder which is perpetrated by any kind of wilful, deliberate and premeditated killing is murder of the first degree.

"To constitute this kind and degree of homicide the killing must be accompanied by a clear, deliberate intent to take life. The intent to kill must be the result of deliberation and must have been formed upon a pre-existing reflection and not under a heat of passion or other condition such as precludes the idea of deliberation.

"There need be, however, no considerable space of time devoted to deliberation or between the formation of the intent to kill and the act of killing. It is only necessary that the act of killing be preceded by, and the result of a concurrence of will, deliberation and premeditation on the part of the slayer to constitute murder in the first degree, regardless of how rapidly or slowly these mental processes succeed each

other or how quickly or tardily they are followed by the act of killing.

"The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with different individuals and under varying circumstances. The true test is not the duration of time, but rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it include an intent to kill, is not such deliberation and premeditation as will fix an unlawful killing as murder of the first degree. To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, decide to and commit the unlawful act causing death.

"Murder of the second degree must be distinguished not only from murder of the first degree, on the one hand, but from manslaughter, on the other.

"If the unlawful killing of a human being is done with malice aforethought, but without deliberation and premeditation, that is, without the wilful, deliberate and premeditated intent to take life which is an essential element of first degree murder, and is not perpetrated by means of poison, or lying in wait, or torture, and is not committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary or mayhem, then the offense is murder in the second degree. In practical application this means that the unlawful killing of a human being with malice aforethought, but without a deliberately formed and premeditated intent to kill, is murder of the second degree."

Considering the above-mentioned instructions together, it is clear that the trial court was endeavoring to follow the rules enunciated in the cases upon which the majority relies (*People* v. *Bender,* 27 Cal.2d 164 [163 P.2d 8]; *People* v. *Valentine,* 28 Cal.2d 121 [169 P.2d 1]; *People* v. *Honeycutt,* 29 Cal.2d 52 [172 P.2d 698]), and I am satisfied that the charge as a whole fully and fairly advised the jury concerning the distinction between first and second degree murder.

The challenged instructions are far different from the instructions which were condemned in the cases last cited. The real vice of such condemned instructions, as pointed out by this court in *People* v. *Bender, supra,* 27 Cal.2d 164, at page

184, did not rest in the giving of the instruction that there need be "no appreciable space of time between the intention to kill and the act of killing." This instruction was declared to be "abstractly a correct statement of the law" (p. 182), but it was further said that it should not be given to a jury "without explanation" and that it was "misleading when read in the context in which it was used" (pp. 182-183). In that case, the above declaration was immediately followed in the same sentence by the words "they may be as instantaneous as successive thoughts of the mind" and was thereafter followed by instructions that "A man may do a thing willfully, deliberately and intentionally from a moment's reflection as well as after pondering over the subject for a month or a year"; and that "He can premeditate, that is, think before doing the act, the moment he conceives the purpose, as well as if the act were the result of long preconcert or preparation" (p. 182). It was stated on page 183 of the Bender case that the effect of this combination of instructions was to eliminate the requirement of any "deliberation or premeditation in forming the intent" to kill or "deliberation and premeditation between the intent and act of killing." As was said in *People* v. *Valentine, supra*, 28 Cal.2d 121, at page 134: "As held in *People* v. *Bender* (1945), *supra*, 27 Cal.2d 164, 182-185, *this combination of instructions, taken as a whole*, substantially deletes the only difference, in this type of case, between first and second degree murder." (Emphasis added.)

It is clear that we have before us no such "combination of instructions" as was condemned in the cited cases. The trial court here adopted the substance of the suggested instructions set forth on pages 184 and 185 of the Bender case, and gave due explanation of, and proper emphasis to, the real meaning of and necessity for deliberation and premeditation. If the majority of this court has determined to go further and to declare that "considerable space of time" must be devoted to deliberation and premeditation in forming the intent to kill or between the intent to kill and the act of killing, then it would be proper for this court to so declare for the guidance of the bench and bar. The word "considerable" conveys the meaning of "rather large in extent" (Webster's New Inter. Dict., 2d ed.), and any such declaration would in effect repudiate the rule contained in this court's suggested instruction that "Neither the statute nor the court undertakes to measure in units of time the length of the period

during which the thought must be pondered before it can ripen into an intent which is truly deliberate and premeditated.'' (*People* v. *Bender, supra,* 27 Cal.2d 164, 184-185.) I do not favor the repudiation of the quoted suggested instruction nor the extension of the rules set forth in the cited cases; and I am convinced that both reason and the cited cases support the conclusion that there was no error in this portion of the trial court's charge dealing with the degrees of murder.

## The Refusal to Instruct on Manslaughter

In considering this phase of the appeal, it is significant to note that the only point now argued by defendant is that the jury should have been instructed on *voluntary* manslaughter as ''the jury should have had the right to determine whether or not the alleged murder was committed in the heat of passion.'' This is a complete abandonment of the claim made at the trial, which was that the defendant's acts constituted no more than *involuntary* manslaughter. I therefore agree with the implication in the majority opinion that defendant was not entitled to an instruction on *voluntary* manslaughter as ''he positively testified that he did not intend to kill or injure anyone.'' Furthermore, I agree with the holding of the majority opinion that however fanciful and unworthy of belief defendant's conflicting versions of the occurrences may appear to be, an instruction on involuntary manslaughter should have been given. It was therefore error to refuse to give such an instruction, but the question remains as to whether there is any likelihood that the jury would have rendered a different verdict if instructions on involuntary manslaughter had been given; or in other words, whether the error was prejudicial.

It will be recalled that defendant was charged with two offenses: (1) the murder of Wilbur McSwain and (2) assault with intent to commit the murder of Alvin McSwain. Under the evidence and instructions, no conviction could have been had on either of the particular offenses charged unless the jury found that defendant had a specific intent to kill the victim. Defendant's claim on the trial was that he never intended to kill or injure either of his victims, and this claim was based upon the evidence recited in the majority opinion and above summarized.

With respect to the first count, the jury was further instructed: ''Thus in the crime of murder [with] which the defendant is accused in this case in Count One of the informa-

tion, the specific intent to kill is a necessary element of the crime.''

With respect to the second count, the jury was instructed in part:

''In the crime of assault with intent to commit murder, there must exist in the mind of the perpetrator the specific, preconceived intent to kill a human being, and a person may not be convicted of such an offense if that specific intent is not established by the evidence.

''When the information charges that the defendant committed an assault with a deadly weapon with intent to commit murder, if the jury should find that he committed the assault ,with a deadly weapon but that he did not do so with a specific, preconceived intent to kill, the defendant may be found guilty only of the lesser offense, namely, assault with a deadly weapon.''

The jury was given the customary instructions regarding the presumption of innocence, the burden of proof, and its duty to acquit the defendant upon any charge unless his guilt had been satisfactorily proved beyond a reasonable doubt. It was given a further instruction with respect to reasonable doubt and the degrees of murder, reading: ''When upon the trial of a charge of murder, the jury is convinced beyond a reasonable doubt that the crime of murder has been committed by a defendant, but has a reasonable doubt whether such murder was of the first or of the second degree, the jury must give to such defendant the benefit of that doubt and return a verdict fixing the murder as of the second degree.''

The jury was further instructed upon its duty to fix the punishment in the event that it found defendant guilty of first degree murder. It therefore appears that the jury was otherwise fully and fairly instructed upon every phase of the case.

Under the given instructions the jury brought in a verdict finding defendant guilty on count one of first degree murder, and fixing the punishment at death; and a further verdict finding defendant guilty on count two of assault with intent to commit murder. It seems obvious that had the jury placed the slightest credence in either of defendant's conflicting versions concerning his claimed unintentional shooting of his victims, or even had the jury any reasonable doubt concerning his intentions, it would not have brought in a verdict finding defendant guilty of first degree murder and fixing the penalty

at death upon the first count; and that it would not have brought in a verdict of assault with intent to commit murder upon the second count. The fact that the jury brought in a verdict finding defendant guilty of an offense higher than second degree murder on the first count, and that it likewise brought in a verdict finding defendant guilty of assault with intent to commit murder, rather than guilty of the included offense of assault with a deadly weapon, affirmatively shows that the jury rejected, in all material particulars, defendant's conflicting stories concerning his unintentional shooting of his victims, and determined, as the overwhelming evidence showed, that his offenses were intentionally committed and were preceded by deliberation and premeditation.

The instant case is closely parallel to *People* v. *Mitchell,* 14 Cal.2d 237 [93 P.2d 121], where this court, in discussing possible prejudice in the failure to give a manslaughter instruction, said, at page 242: "If under the evidence and these instructions, the jury rendered a verdict calling for the death penalty, it is not reasonable to suppose that its verdict would have been different had the proposed instruction on manslaughter been given." (See, also, *People* v. *Driscoll,* 53 Cal.App.2d 590, 595 [128 P.2d 382]; *People* v. *Miller,* 67 Cal.App. 674, 679 [228 P. 68].)

The conclusion that the judgment in this case should not be reversed finds support in the above-mentioned authorities and does not conflict with the decision in any of the cited cases. Those cases wherein judgments of conviction have been reversed for the failure or refusal to give instructions on an included offense are clearly distinguishable from the instant case, and are of two types. In the first type, the crime charged was not divided into degrees and under the instructions, the jury was necessarily required to exonerate defendant entirely or to convict him of the offense charged. (*People* v. *Comyns,* 114 Cal. 107 [45 P. 1034]; *People* v. *Demasters,* 105 Cal. 669 [39 P. 35]; *People* v. *Burns,* 88 Cal.App.2d 867 [200 P.2d 134]; *People* v. *Cicerelli,* 123 Cal.App. 48 [10 P.2d 792]; *People* v. *Mock Ming Fat,* 82 Cal.App. 618 [256 P. 270]; *People* v. *Stofer,* 3 Cal.App. 416 [86 P. 734].) In that type of case, the jury might well conclude that a public offense had been committed and therefore be reluctant to exonerate the defendant. Plainly, the failure to instruct on the included offense might well prejudice the defendant. In the second type, the crime charged was divided into degrees and defendant was convicted of the lesser degree, and might well have been

convicted of an included offense if proper instructions thereon had been given. (*People* v. *Foss*, 85 Cal.App. 269 [259 P. 123]; *People* v. *Wilson*, 29 Cal.App. 563 [156 P. 377]; *People* v. *Hayes*, 9 Cal.App. 301 [99 P. 386]; *People* v. *Sidelinger*, 9 Cal.App. 298 [99 P. 390].) Not a single case has been cited, nor does independent research disclose any case where any court of this state has reversed a judgment of conviction where defendant had been convicted of the highest possible degree of a crime, divided into degrees, merely because the trial court failed or refused to give instructions on an included offense. The broad language employed in some of the cases cited in the majority opinion must be read in the light of the particular situations which were being considered by the courts.

From what has been said, it clearly appears that there is not the slightest possibility that the jury would have brought in a different verdict had an instruction on involuntary manslaughter been given. I therefore conclude that the error of the trial court in failing to give such instruction is precisely the type of error to which the constitutional provision was directed, and that it is our duty under the constitutional mandate to affirm the judgment of conviction of first degree murder.

I would therefore affirm the judgments of conviction and the orders denying the motions for new trial as to both counts.

Shenk, J., and Edmonds, J., concurred.

Respondent's petition for a rehearing was denied March 29, 1951. Shenk, J., Edmonds, J., and Spence, J., voted for a rehearing.