Filed 4/8/21  P. v. Pasillas CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C085011 |
| Plaintiff and Respondent, | (Super. Ct. No. 16F5488) |
| v. | |
| ROBERT JOSEPH PASILLAS, | |
| Defendant and Appellant. | |

A jury found defendant Robert Joseph Pasillas guilty of second degree murder of Jon (count 1) and possession of a firearm by a person who has been convicted of a felony (count 3).  The jury found true that defendant personally and intentionally discharged a firearm causing great bodily injury or death in the commission of count 1.  (Pen. Code, § 12022.53, subd. (d).)[1]  The jury found defendant not guilty of first degree residential burglary (count 2).

---

[1]  Undesignated statutory references are to the Penal Code.

1

The trial court sentenced defendant to a total term of 3 years plus 40 years to life in prison: the upper term of three years for count 3, and 15 years to life for count 1 plus 25 years to life for the firearm enhancement under section 12022.53, subdivision (d). The court found true that defendant had a prior prison term under section 667.5, subdivision (b), but did not impose a sentence based on that enhancement.

On appeal, defendant asserts: (1) the trial court erred by failing to instruct on involuntary manslaughter and defense of another; (2) the court abused its discretion in excluding expert testimony and lab results on the basis of insufficient foundation; (3) his trial counsel rendered ineffective assistance; and (4) we should remand to allow the trial court to exercise its newly granted discretion under section 12022.53 to strike the firearm enhancement.

We agree remand is appropriate to allow the trial court to consider whether to strike or dismiss defendant's firearm enhancement. Additionally, because defendant's prior conviction no longer qualifies for a sentence enhancement under section 667.5, subdivision (b), we strike the trial court's true finding on that enhancement. (Stats. 2019, ch. 590, § 1.) In all other respects, we affirm.

## I. BACKGROUND

*A.     Prosecution's Evidence*

Jon's ex-girlfriend testified that on the evening of January 6, 2016, she went to Jon's house and sat in a car with defendant as they called Jon. Jon did not answer the phone. J.H. arrived in a second car, and then J.H. and defendant got out of their cars.

Jon's current girlfriend testified that she and Jon were in his living room when they saw two cars approach. Jon said, " 'It looks like we have company. What do you want to do?' " He told her everything would be okay. Jon opened the door a little bit, and defendant pushed himself in. J.H. was right behind defendant, and they jumped over the couch. J.H. stood over Jon's girlfriend, who was seated. Defendant was behind J.H.

2

and in front of Jon. Jon's girlfriend heard a pop and saw Jon fall to the ground. She testified that she asked, " 'Who shot Jon?' " Defendant replied, " 'I fucking did.' "

The forensic pathologist who performed an autopsy on Jon's body testified that he observed an entry gunshot wound on Jon's chest and an exit wound in his back. The pathologist said the entry hole "had all the characteristics of a contact gunshot wound. That means the muzzle of the firearm was pressed tightly against the skin surface." The pathologist opined Jon bled to death from the bullet passing through his aorta.

### B. Defense Evidence

Defendant testified that he was welcomed into Jon's house. After he and J.H. entered, Jon's girlfriend started yelling at J.H. Defendant said it looked like the girlfriend was reaching for a gun that was on the table, so he grabbed it with his non-dominant hand to keep it from the women. The women were starting to fight. Defendant said he took a step toward them, and Jon was coming with a bat: "I didn't want him to use it on [J.H]. And I know he's not going to use it on me, and so . . . I stepped in between them, I turned to Jon, I said 'Hey, man, just take this gun, go put it up.' And as I go to push him, the gun just went off."

J.H. testified that Jon's girlfriend stood up and started screaming at her as soon as she entered the house, and then the girlfriend looked over at a table that had a gun on it. Before the girlfriend could grab the gun, J.H. went toward her and they wrestled and hit the ground. Then, J.H. heard a loud noise. J.H. and defendant ran out of the house without saying anything.

## II. DISCUSSION

### A. Involuntary Manslaughter

#### 1. Trial Court Proceedings

The jury was instructed on voluntary manslaughter, and first and second degree murder. The jury was also instructed that defendant was not guilty of murder or manslaughter if he killed someone as a result of accident or misfortune. During the jury

3

instruction conference, the court and the parties discussed whether the jury should also be instructed on involuntary manslaughter. Ultimately, the court decided not to give the instruction.

### 2. *No Prejudice*

Defendant contends the trial court had a sua sponte duty to instruct on the lesser included offense of involuntary manslaughter. We conclude any error was harmless.

"A trial court has a sua sponte duty to 'instruct on a lesser offense necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser.' [Citation.] Substantial evidence in this context is evidence from which a reasonable jury could conclude that the defendant committed the lesser, but not the greater, offense." (*People v. Shockley* (2013) 58 Cal.4th 400, 403.) "On appeal, we review independently the question whether the trial court failed to instruct on a lesser included offense." (*People v. Cole* (2004) 33 Cal.4th 1158, 1215.)

Manslaughter is the unlawful killing of a human being without malice. (§ 192.) It is a lesser included offense of murder. (*People v. Thomas* (2012) 53 Cal.4th 771, 813.) Section 192 defines involuntary manslaughter as a killing occurring during the commission of "an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b).) " 'The words "without due caution and circumspection" refer to criminal negligence—unintentional conduct which is gross or reckless, amounting to a disregard of human life or an indifference to the consequences.' " (*People v. Guillen* (2014) 227 Cal.App.4th 934, 1027.)

"The failure to instruct on a lesser included offense in a noncapital case does not require reversal 'unless an examination of the entire record establishes a reasonable probability that the error affected the outcome.' [Citation.] 'Such posttrial review focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an

appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*People v. Thomas*, *supra*, 53 Cal.4th at p. 814, fn. omitted.)

Defendant argues there was substantial evidence to support an involuntary manslaughter instruction on three different theories. First, he argues the jury could have concluded Jon died of an accidental shooting that occurred while defendant pushed Jon with the gun while defendant was engaged in the unlawful act of brandishing the firearm (§ 417, subd. (a)(2))[2] or misdemeanor battery using the firearm (§ 242). (See *People v. Thomas*, *supra*, 53 Cal.4th at p. 814 ["an accidental shooting that occurs while the defendant is brandishing a firearm in violation of section 417 could be involuntary manslaughter"].) He also contends blocking Jon by pushing him with a firearm in hand could be viewed as a lawful act that might produce death, done in an unlawful matter or without due caution or circumspection. (§ 192, subd. (b); see *People v. Carmen* (1951) 36 Cal.2d 768, 776, disapproved on other grounds in *People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 ["It has been held repeatedly that a killing resulting from the negligent handling of firearms may be manslaughter"].) Defendant argues that, based on the evidence, it is plausible the jury convicted him of second degree murder based on an implied malice theory, and it is reasonably probable the jury would have found him guilty of involuntary manslaughter had it been instructed on that offense because of the doctrinal similarities between criminal negligence and implied malice. We are not

---

[2] "Every person who, except in self-defense, in the presence of any other person, draws or exhibits any firearm, whether loaded or unloaded, in a rude, angry, or threatening manner, or who in any manner, unlawfully uses a firearm in any fight or quarrel is" guilty of a misdemeanor. (§ 417, subd. (a)(2).)

persuaded. Defendant's proposed theories to support involuntary manslaughter are all based on accidental discharge of the firearm. Here, the jury found defendant intentionally, not accidently, discharged a firearm causing death during the commission of murder by finding the firearm enhancement allegation pursuant to section 12022.53, subdivision (d) true. "Error in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1085-1086.) By finding defendant intentionally discharged the firearm, the jury necessarily rejected a prerequisite for finding defendant guilty of involuntary manslaughter.

Defendant notes the jury asked the court if "intended" in the context of the instructions on the firearm allegation was defined by the portion of the instruction that explained, "[a]n act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence." The court responded it did not, and explained that these lines refer to the causation element in that instruction. The court further referred the jury to instructions explaining "[w]ords and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings." Defendant's attempt to use the jury's question to cast doubt on the jury's ultimate conclusion is unavailing. The court correctly instructed the jury regarding the firearm enhancement and responded to its question. "Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions." (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) The jury found beyond a reasonable doubt that defendant fired the gun intentionally within the plain meaning of that term, proximately causing Jon's death. If the jury had a

reasonable doubt about whether the gun was accidentally discharged, the jury would not have found the firearm enhancement true. Any error in the omission of instructions on involuntary manslaughter was harmless.

B.    *Defense of Another*

Defendant contends the court erred in failing to instruct on perfect or imperfect defense of another. We disagree.

"In the absence of a request for a particular instruction, a trial court's obligation to instruct on a particular defense arises ' "only if [1] it appears that the defendant is relying on such a defense, or [2] if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." ' " (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1148.)

Here, the court asked if defendant was requesting CALCRIM No. 505 on self-defense or defense of another. Defense counsel initially responded, "I think it applies." The court then observed that the evidence did not demonstrate defendant shot in defense, but rather that he grabbed the gun to prevent the women from getting it. Defense counsel then said, "In reflection, I think you're right. I think he has to consciously use deadly force, and we're not arguing that." The court stated the instruction was inapplicable and not requested by the defense. Defense counsel did not object to this characterization. Instead, he stated defendant did not want a manslaughter instruction and "[h]e'd rather go all or nothing on the accident."

Self-defense and defense of others are related concepts. (*People v. Randle* (2005) 35 Cal.4th 987, 994, overruled on another point in *People v. Chun* (2009) 45 Cal.4th 1172, 1201.) "[B]oth self-defense and defense of others, whether perfect or imperfect, require an actual fear of imminent harm." (*People v. Butler* (2009) 46 Cal.4th 847, 868, emphasis omitted.) The defense is perfect and the killing is neither murder nor manslaughter but a justifiable homicide when the defendant's belief in the necessity of defending oneself from imminent danger of death or great bodily injury is reasonable.

7

(*Randle, supra*, at p. 994.) "[O]ne who kills in imperfect defense of others—in the actual but unreasonable belief he must defend another from imminent danger of death or great bodily injury—is guilty only of manslaughter." (*Id*. at pp. 997.) As reflected in the discussion regarding jury instructions and defendant's testimony at trial, defendant's theory of the case was that the gun discharged accidentally. This is inconsistent with a claim of perfect or imperfect defense of another because neither applies to an accidental shooting. (*People v. Curtis* (1994) 30 Cal.App.4th 1337, 1357-1359.) Thus, because defendant was clear that he was not seeking an instruction on self-defense or defense of another, the court had no obligation to give one. The authorities on which defendant relies are inapplicable because they each involve a request for a self-defense instruction despite a claim of accidental shooting. (See *People v. Villanueva* (2008) 169 Cal.App.4th 41, 52 ["As there was sufficient evidence of self-defense, and defendant requested the instruction, the trial court was required to give the instruction"]; *People v. Elize* (1999) 71 Cal.App.4th 605, 616 ["the issue of sua sponte duty or not has no place in this case"].) The court did not err by not instructing on perfect or imperfect defense of another.

C.     *Exclusion of Evidence Related to Methamphetamine Use*

       1.     *Trial Court Proceedings*

       Before trial, the defense sought to admit, and the prosecution sought to exclude, evidence of methamphetamine in Jon's blood and expert testimony about methamphetamine use. Defendant's motion in limine indicated a blood sample was extracted during Jon's autopsy and sent to a laboratory in Pennsylvania that reported finding 4100 ng/mL of methamphetamine in the sample. Defendant's motion proposed testimony by closed-circuit television of a lab technician regarding the results. The motion indicated the defense had retained the services of an expert in addictive disorders who had worked in the field of substance abuse for over 35 years. The expert would testify regarding the general effects of methamphetamine including violent behavior, an inability to perceive surroundings accurately, and paranoia.

8

At the hearing on these motions, the court expressed that its preliminary thoughts were concern for a lack of foundation.

Defense counsel suggested defendant might testify that Jon was acting unusually and defendant intervened to keep Jon from hitting J.H. with a baseball bat.

The court stated that an Evidence Code section 402 hearing might be required to find out what the expert could testify to. It expressed concern that the expert's background appeared to be in counseling, and she might not be qualified to reach a conclusion based on the lab results. The court asked if anything had been provided about what the expert would testify to. Defense counsel submitted a written summary of a meeting with the expert. It stated the expert could testify to the following:

"Chronic [m]eth users experience serious social, psychological, and physical dysfunctions as a result of [m]eth use.

"Chronic heavy [m]eth users suffer psychotic symptoms that include hyper auditory, visual hallucinations and delusional thinking.

"Chronic abuse of [m]eth leads to psychotic behaviors including extreme aggression. When addicts use [m]eth over and over, the drug changes their brain chemistry. These changes in the brain can lead to violent behavior.

"Meth is a stimul[ant] that causes the brain to release high doses of adrenaline, the body's fight or flight mechanism. This is called tweaking. When a [m]eth user is tweaking, their auditory and visual sensory mechanism is over stimulated and causes hyper reactions.

"Meth use changes the molecular structure of the brain, over stimulating the amygdala, the emotional control center of the brain and compromises the circuits needed to control impulsive behavior.

"Chronic [m]eth users destabilize normal function in the pre-frontal cortex which disrupts control over the amygdala. This loss of control triggers erratic emotional states.

9

"Chronic meth users are prone to have an increased sense of paranoia causing volatile emotional states, or psychosis."

After reviewing the summary, the court expressed concern that the first few items referred to chronic methamphetamine users, and the court had only heard that Jon smoked methamphetamine sometime in the day and a half prior to the incident. Defense counsel indicated Jon told his client that he had problems with methamphetamine use. The court stated it needed to wait to see what evidence was ultimately introduced. Further, the court said it did not have a "high level of confidence of what" the expert would testify to or what she could say because it did not think there would be substantial evidence of chronic methamphetamine use.

The prosecutor indicated "[t]here's no chain of custody or person who tested that methamphetamine" and she would not "stipulate to that result. It's a lab from the east coast that I'm not familiar with. There's no foundation for that actual result to come in."

The court asked defense counsel to clarify what the offer of proof had been. Defense counsel responded, "There was no offer. The chronic abuse of methamphetamine can lead to psychotic issues." Defense counsel later suggested the expert could testify that people who have the level of methamphetamine indicated in the lab report in their blood can be dissociated from reality, psychotic, and paranoid. The court stated there did not appear to be evidence that, during the relevant 20 second time period in which the incident occurred, Jon acted in such a way. Further, the court noted the evidence was consistent with someone defending his property, self, or girlfriend rather than being paranoid.

The court explained that even if the defense could establish chain of custody as to the results, "that doesn't get us anywhere because we don't know how it actually impacted this particular individual." The court indicated it did not know whether Jon was a chronic abuser or when the methamphetamine was used. "It's very problematic. So all I can order right now is that neither party go into the methamphetamine in your opening

10

statements. If you think that you have that evidence and feel you can present it, you'll have to present it to me at some point, and we'll have to discuss whether these witnesses are going to be allowed to testify or what evidence is going to come in. I think that's all we can do."

Later in pretrial proceedings, the court raised the applicability of our Supreme Court's decision in *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*) to this issue. The court and defense counsel discussed what would be necessary to establish the methamphetamine in Jon's blood. Defense counsel stated he was still working on it, but understood that the court would require more before admitting the evidence. The court indicated it still had questions regarding what the information would be used for, what the expert testimony would be, and what evidence would be presented. Defense counsel responded, "it's just premature at this point. I just have to wait. I think we can address this issue later depending on my proof."

During trial, the forensic pathologist was questioned by defense counsel outside the presence of the jury. The pathologist testified that it was routine in homicides to send blood out for evaluation to check for illegal substances. He extracted a sample of Jon's blood, and the lab results indicated the sample tested positive for methamphetamine. The pathologist stated that this information made no difference in determining the cause of Jon's death.

The prosecutor did not object to this testimony but indicated she did not think the pathologist could testify as to the specific result or any information that was found in the test results.

The court stated for the record that "this particular testimony regarding the result would not be coming in for the truth of the matter asserted, because the defense has not and does not appear to be able to lay the foundation for the result. So I would have to instruct the jury they're not to consider the test for the truth that there was methamphetamine in his system because—just only for the effect that that information

11

had on the doctor's conclusions as to the cause of death. So with that in mind, it seems like it is of no relevance."

Defense counsel responded that he would not be asking the pathologist any questions on the record.

The court said defense counsel "can only do what he can do under the circumstances. And he has a big hill to climb, because I've already kind of given my tentative views of what [the expert] would testify to, and what she would be able to conclude based solely on a result. Even if it's a high amount of methamphetamine in a person's system, she can't come in and say that he was a chronic user of methamphetamine. I doubt she could testify even how much time prior it was used. . . . I don't know how she could testify to the effect it would have on this particular person. [¶] . . . [¶] So . . . , I'm not really surprised [defense counsel] is not even going to go there because what could he really do with that information at this point."

### 2. *No Foundation*

On appeal, defendant contends the trial court abused its discretion in excluding his expert's testimony and the lab results on the basis of insufficient foundation. To support this contention, defendant asserts the court mischaracterized the expert's testimony as pertaining to chronic users because some of the proposed testimony concerned the effects of being under the influence generally.

"We review a trial court's decision to exclude evidence for abuse of discretion. [Citation.] The decision to exclude evidence 'will not be disturbed except on a showing [that] the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation].' " (*People v. Peoples* (2016) 62 Cal.4th 718, 745.)

As a threshold matter, we note defendant never laid a foundation for the admission of the methamphetamine levels in Jon's blood. Thus, his claim that the court erred in excluding this evidence is unavailing. Additionally, the court's concerns about the

12

expert's testimony based on what had been proffered to it at that point appear to be supported by the record. Further, defendant did not ask the trial court for a final ruling regarding proffered expert testimony based on any corresponding admissible evidence of methamphetamine use. "A tentative pretrial evidentiary ruling, made without fully knowing what the trial evidence would show, will not preserve the issue for appeal if the appellant could have, but did not, renew the objection or offer of proof and press for a final ruling in the changed context of the trial evidence itself. [Citations.] ' " 'Where the court rejects evidence temporarily or withholds a decision as to its admissibility, the party desiring to introduce the evidence should renew his offer, or call the court's attention to the fact that a definite decision is desired.' " ' " (*People v. Holloway* (2004) 33 Cal.4th 96, 133.) We must reject defendant's claim that the trial court abused its discretion in excluding expert testimony or lab results related to methamphetamine use.

### D. *No Ineffective Assistance of Counsel*

Defendant alleges his trial counsel rendered ineffective assistance with respect to the issues we have already discussed. Defendant relies, in part, on a declaration filed by his trial counsel in support of a motion for new trial in which trial counsel argued, in part, that defendant did not receive adequate assistance.

"To establish ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. [Citation.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citation.] 'In determining whether counsel's performance was deficient, a court must in general exercise deferential scrutiny . . .' and must 'view and assess the reasonableness of counsel's acts or omissions . . . under the circumstances as they stood at the time that counsel acted or failed to act.' [Citation.] Although deference is not abdication

13

[citation], courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight." (*People v. Scott* (1997) 15 Cal.4th 1188, 1211-1212.) "[W]here counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions." (*People v. Jones* (2003) 29 Cal.4th 1229, 1254.)

### 1. Defense of Another

On appeal, defendant contends his counsel rendered ineffective assistance by not arguing for an instruction on defense of another. In his declaration in support of defendant's motion for a new trial, defendant's trial counsel stated accident and self-defense are not inconsistent, and argued, "I was convinced by the court[] of this proposition, which affected how I presented evidence and argued the case to the detriment of the defendant by foreclosing an affirmative defense. It was not a strategic decision; it's just that the court was not going to change its position."

As we have discussed, a defense of accident *is* inconsistent with any defense of another instruction. (*People v. Curtis*, *supra*, 30 Cal.App.4th at pp. 1357-1359.) Thus, trial counsel's assertion that he rendered ineffective assistance is based on a false premise. Indeed, trial counsel also argued he should *not* have requested the court to instruct on voluntary manslaughter because it "did not fit the defense theory of the case, which was an accidental discharge." The court instructed the jury on voluntary manslaughter based on a sudden quarrel or heat of passion. But one who kills in imperfect defense of another is also guilty of voluntary manslaughter. (*People v. Randle*, *supra*, 35 Cal.4th at pp. 990, 997.) Thus, even this post-trial declaration lends weak support for the idea that defense counsel should have requested an instruction on defense of another. The court viewed the statements in the declaration as defense counsel's "gratuitous after-the-fact opinions . . . like buyer's remorse; you can say whatever you want to say after the fact to fit the situation. If he wants to say . . . he's incompetent or he

14

should have—he thought that—or he felt a particular instruction should have been given . . . now is not the time to do that. But at trial we did spend a lot of time discussing these issues, and the—[defense counsel]'s tactical decision was, in the end, that he was relying on accident. That's what the Defendant wanted to do, and so, ultimately, I instructed on accident."

Regardless, we cannot conclude defendant's trial counsel's failure to request any defense of another instruction fell below an objective standard of reasonableness. It is true that a defendant may successfully request an instruction on defense of another where one can infer the defendant engaged in defense of another, even if it is inconsistent with defendant's theory of the case and requires disbelieving part of the defendant's testimony. (See *People v. Elize, supra*, 71 Cal.App.4th at pp. 615, 616 ["A jury could find that defendant fired the gun intentionally, hoping to end the attack upon him either by hitting one of his assailants or by firing into the air to scare off his attackers"].) Nonetheless, "[t]he presentation of conflicting defenses is often tactically unwise because it tends to weaken counsel's credibility with the jury." (*People v. Jones* (1991) 53 Cal.3d 1115, 1138.) Thus, a lawyer is not constitutionally ineffective because he chooses one defense theory over another. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1005-1006.) In particular, counsel need not request a jury instruction on a conflicting defense. (See *People v. Wader* (1993) 5 Cal.4th 610, 643 ["we cannot say that defense counsel had no rational tactical purpose in not requesting an instruction on intoxication"].) We conclude defense counsel made a reasonable tactical choice in not requesting any defense of another instruction.

### 2.     *Involuntary Manslaughter*

Defendant argues his trial counsel failed to effectively argue for an instruction on the lesser included offense of involuntary manslaughter. Given our conclusion that any failure to instruct on involuntary manslaughter was harmless, defendant's assertion that

his trial counsel rendered ineffective assistance on this point is without merit because he cannot establish resultant prejudice.

3.      *Methamphetamine Evidence*

Defendant contends his trial counsel rendered ineffective assistance by failing to produce witnesses needed to introduce the methamphetamine evidence.  He contends his trial counsel should have done more to put this evidence before the jury, such as arranging for the testimony of the out-of-state toxicologist, reanalyzing the blood sample, and conducting an Evidence Code section 402 hearing to flesh out the scope of his proposed expert witness's testimony.  None of these arguments are supported by statements from his trial counsel indicating why any of these measures were not taken.  Trial counsel did state in his declaration that defendant could have testified Jon was a chronic methamphetamine user, but no further information was provided such as the basis for this knowledge or whether defendant could have testified Jon appeared in any way under the influence of methamphetamine at the time of the incident.

Defendant contends his counsel's failure to produce witnesses needed to introduce methamphetamine evidence "resulted in deficient testing of the prosecution's case."  When trial counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing," there is a presumption that the result is unreliable and prejudice need not be affirmatively shown.  (*United States v. Cronic* (1984) 466 U.S. 648, 659.)  Defendant's allegations do not " 'show a complete lack of adversarial testing under *Cronic*.' "  (*People v. Carrasco* (2014) 59 Cal.4th 924, 990-991 [counsel " 'gave an opening statement and closing argument, cross-examined the prosecution's witnesses, objected to testimony and exhibits, and presented a number of witnesses on defendant's behalf during the guilt and penalty phases of the trial' "].)  Further, the methamphetamine evidence was most relevant to a self-defense or defense of another theory, neither of which was presented.  Again, a lawyer is not constitutionally ineffective because he chooses one defense theory over another.  (*People v. Cunningham*, *supra*, 25 Cal.4th at

16

pp. 1005-1006.) We cannot conclude on this record that counsel did not have a reasonable tactical basis for not further pursuing the admission of the methamphetamine evidence.

Accordingly, we reject defendant's claims of ineffective assistance of counsel.

## E.    *Prior Prison Term Enhancement*

The court found true that defendant had a prior prison term under section 667.5, subdivision (b), but, as the People note, it did not impose a sentence based on that enhancement. The court did not indicate its reasoning, but defendant's prior conviction no longer qualifies for the enhancement. (Stats. 2019, ch. 590, § 1.) As such, we will strike the true finding on the enhancement.

## F.    *Firearm Enhancement*

The trial court sentenced defendant to 25 years to life for the firearm enhancement under section 12022.53, subdivision (d). Defendant contends, and the People concede, that this case must be remanded so the trial court can decide whether to strike the firearm enhancement pursuant to Senate Bill No. 620 (2017-2018 Reg. Sess.). We accept the People's concession.

When defendant was sentenced, the firearm enhancement was mandatory. (§ 12022.53, former subd. (h).) "But the Legislature subsequently passed Senate Bill No. 620 (2017-2018 Reg. Sess.), which amended section 12022.53 to now provide that '[t]he court may, in the interest of justice . . . strike or dismiss an enhancement otherwise required to be imposed by this section.' (§ 12022.53, subd. (h).)" (*People v. Flores* (2020) 9 Cal.5th 371, 431.) Our Supreme Court has explained that the appropriate remedy in this circumstance " 'is to remand for resentencing unless the record "clearly indicate[s]" that the trial court would have reached the same conclusion "even if it had been aware that it had such discretion." ' " (*Id.* at p. 432.) Because no such indication appears on this record, remand is required.

17

## III.  DISPOSITION

The trial court's finding that defendant had a prior prison term under section 667.5, subdivision (b) is stricken.  The matter is remanded to allow the trial court to consider whether to exercise its discretion to strike or dismiss the section 12022.53 enhancement.  The judgment is otherwise affirmed.

/S/

_____

RENNER, J.

We concur:

/S/

_____

RAYE, P. J.

/S/

_____

DUARTE, J.